IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CR-00184-FL-5
No. 5:15-CR-00184-FL-6

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| ELIZABETH PAIGE SYKES, | ) | |
| JOHN BOYNTON SIDBURY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court to address certain evidentiary motions filed by Defendants

Elizabeth Paige Sykes ("Defendant Sykes") and John Boynton Sidbury ("Defendant Sidbury").

Generally, the evidentiary motions address the admissibility of Global Positioning System

("GPS") information collected from each of Defendants' cell phones pursuant to orders issued

by North Carolina superior court judges and the extent to which any information collected

subsequent to and as a result of investigatory techniques that incorporated the cell phone GPS

information may be evaluated pursuant to the fruit of the poisonous tree doctrine. Additionally,

the motions address the admissibility of GPS information collected from location tracking

devices on Defendant Sidbury's vehicles; the admissibility of certain statements made by

Defendants; the validity of a consent to search form signed by Defendant Sykes to allow officers

to forensically download all data from her electronic devices; the admissibility of Defendants'

bank records; and whether certain counts of the indictment should be dismissed. These motions

have been referred to the undersigned for recommendation to the District Court pursuant to 28

U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b)(1):

      1.     Defendant Sidbury's Motion to Suppress Fruits of Warrantless GPS Cell Phone
Tracking ("Motion to Suppress Cell Phone Tracking") [DE-128] and Defendant

Sykes' Motion to Adopt Co-Defendant's Motion to Suppress Fruits of Warrantless GPS Cell Phone Tracking [DE-129];

2.  Defendant Sidbury's Motion to Suppress Fruits of Warrantless GPS Vehicle Tracking ("Motion to Suppress Vehicle Tracking") [DE-133];

3.  Defendant Sidbury's Motion to Suppress Bank Records [DE-136] and Motion to Dismiss Count Three as Constitutionally Defective, Alternative Motion for a Bill of Particulars [DE-144], and Defendant Sykes' Motion to Join Co-Defendant's Motion to Suppress (1) Bank Records & (2) Motion to Dismiss Count III and Alternative Motion for a Bill of Particulars [DE-146];

4.  Defendant Sykes' Motion to Suppress Statements Obtained in Violation of the Fifth Amendment [DE-138];

5.  Defendant Sykes' Motion to Suppress Fruits of Illegal Search of Electronic Devices [DE-139];

6.  Defendant Sidbury's Motion to Suppress Involuntary Statements [DE-140]; and

7.  Defendant Sidbury's Motion to Dismiss Count One for Insufficiency of the Indictment, Alternative Motion for a Bill of Particulars [DE-143].

The Government filed responses in opposition to the Defendants' motions [DE-151, -154, -155, -156, -157] and the undersigned held an evidentiary hearing on February 23, 24, and 25, 2016 to further develop the record. Hr'g Tr. [DE-194, -210, -212]. Following the evidentiary hearing, the Defendants filed a joint supplemental brief [DE-203], to which the Government responded [DE-213]. Accordingly, these matters are ripe for review. For the reasons stated below, it is recommended that Defendant Sidbury's motion to suppress cell phone tracking [DE-128] and Defendant Sykes' motion to adopt [DE-129] be granted; to the extent the results of the vehicle tracking and the bank records are determined not to be fruit of the unconstitutionally-collected cell phone GPS data, it is recommended in the alternative that Defendant Sidbury's motion to suppress vehicle tracking [DE-133] be granted and Defendant Sidbury's motion to suppress bank records [DE-136] and Defendant Sykes' motion to join [DE-146] be denied; and that Defendant

2

Sykes' motion to suppress statements [DE-138] and motion to suppress fruits of the electronic search [DE-139], Defendant Sidbury's motion to suppress statements [DE-140], Defendant Sidbury's motion to dismiss count one of the indictment [DE-143], and Defendant Sidbury's motion to dismiss count three of the indictment [DE-144] and Defendant Sykes' motion to join [DE-146] be denied.

## I. PROCEDURAL BACKGROUND

On August 19, 2015, a Grant Jury sitting in the Eastern District of North Carolina charged Defendants Sykes and Sidbury in a multi-defendant three-count indictment with one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956 and charged Defendant Sidbury with one count of conspiracy to knowingly and intentionally distribute and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846. Second Superseding Indictment [DE-40]. Defendants' arraignment has been continued and will be reset no sooner than thirty (30) days after the issuance of a final ruling on the pending evidentiary motions. May 31, 2016 Order [DE-229].

The court held a suppression hearing on February 23, 24, and 25, 2016. Defendant Sidbury testified on his own behalf, in addition to presenting the testimony of Lawrence Daniel, who testified as an expert witness on cell phonephone location technology for purposes of the suppression hearing. Defendant Sidbury submitted eight exhibits: (1) a printout of a PowerPoint presentation on the motion to suppress cell phone tracking (Def. Sidbury's Ex. 1); (2) an investigation report authored by Task Force Officer Jones (Def. Sidbury's Ex. 2); (3) handwritten notes from Drug Enforcement Administration ("DEA") Agent John Butler (Def. Sidbury's Ex. 3); (4) an application and order for a pen register and trap and trace device for phone number 919-780-7361 signed on April 21, 2015 by United States Magistrate Judge Robert

3

T. Numbers, II (Def. Sidbury's Ex. 4); (5) an application and order for cell phone tracking of phone numbers 919-780-7361 and 404-626-6163 signed on February 10, 2015 by Wake County Superior Court Judge Donald W. Stephens (Def. Sidbury's Ex. 5); a packet of four anonymous letters regarding Defendant Sidbury (Def. Sidbury's Ex. 6); a printout of an email sent to Detective Heckman from AT&T containing GPS coordinates of a tracked cell phone (Def. Sidbury's Ex. 7); and a printout of a PowerPoint presentation on the motion to suppress vehicle tracking (Def. Sidbury's Ex. 8). Defendant Sykes testified on her own behalf and submitted one exhibit: an Equifax credit report for Defendant Sidbury (Def. Sykes' Ex. 9).

The Government presented the testimony of three witnesses, all from the Raleigh Police Department: (1) Detective Keith Heckman ("Detective Heckman"); (2) Sergeant Tony Pennica ("Sergeant Pennica"); and (3) Detective Bill Nordstrom ("Detective Nordstrom"). The Government also presented three exhibits: (1) a printout of the GPS tracking results for phone number 919-809-3016 (Gov't Ex. 1); (2) a Raleigh Police Department consent to search form signed by Defendant Sykes (Gov't Ex. 2); and (3) an audio recording of the interview conducted in the hospital between Detective Nordstrom and Defendant Sidbury (Gov't Ex. 4). All exhibits were admitted without objection.

Additionally, a joint hearing plan submitted by the parties to aid the court in the management of the suppression hearing was entered into the record. [DE-190]. After the hearing, Defendant Sidbury filed a notice clarifying which previously-filed exhibits were referenced in the PowerPoint presentations during the hearing and attaching additional exhibits not previously filed. [DE-192]. Defendant Sykes filed a notice attaching photographs used as exhibits during the suppression hearing. [DE-200].

The facts pertinent to the resolution of each motion are summarized below.

## II. DISCUSSION

**A.** **Defendant Sidbury's Motion to Suppress Cell Phone Tracking [DE-128] and Defendant Sykes' Motion to Join [DE-129]**

Defendants move to suppress any information obtained from the real-time GPS location tracking (and other precision location tracking) of their cell phones, arguing that real-time warrantless tracking constitutes a search for Fourth Amendment purposes and the state court orders that purported to allow this tracking were issued on a finding of less than probable cause. Def. Sidbury's Mot. [DE-128]; Def. Sykes' Mot. to Join [DE-129]. Defendants also argue that the good faith exception does not apply for the following reasons: (1) officers continued to obtain state court orders in violation of a federal court order signed by a United States Magistrate Judge prohibiting the real-time tracking of the target cell phones; (2) any reasonable officer would have known that warrantless tracking of a person's movements within his or her home violated the Fourth Amendment after *United States v. Karo*, 468 U.S. 705 (1984); (3) in light of *United States v. Jones*, — U.S. —, 132 S. Ct. 945 (2012), officers should have known that they needed a warrant to conduct extensive precision location monitoring; (4) the statutes referenced in the state court tracking orders prohibit prospective location tracking; (5) no binding appellate precedent allowed the warrantless tracking; and (6) the state court orders were facially invalid as they purport to allow precision location tracking of not only the target telephone number, but also of any other telephones with which the target phone communicates. Def. Sidbury's Mot. [DE-128].

In response, the Government argues that the state court tracking orders meet the Fourth Amendment's three requirements for a warrant as discussed by the Supreme Court in *Dalia v. United States*, 441 U.S. 238 (1979): the warrant must be issued by a neutral magistrate, upon a

showing of probable cause, and particularly describe the place to be searched or the things to be seized. Gov't Resp. [DE-157]. Additionally, the Government argues that suppression is not appropriate unless there is an actual Fourth Amendment violation, regardless of whether other technical warrant requirements are met. *Id.* The Government contends that this case is on point with *United States v. Wilford*, 961 F. Supp. 2d 740, 757 (D. Md. June 7, 2013), *reconsidered in part* (Nov. 27, 2013), which held that state court orders authorizing GPS tracking of cell phones complied with the Fourth Amendment's warrant requirements even though they were styled as orders rather than warrants, and the judges in this case specifically stated that the orders were issued upon a finding of probable cause. Gov't Resp. [DE-157]. Further, the Government points out that real-time GPS information was not requested in the federal pen register and trap and trace application submitted to Magistrate Judge Numbers and the resulting order simply states that it does not permit the officers to obtain such information, and the good faith exception should apply where (1) multiple judges signed and approved the state court tracking orders, (2) the same unit of police officers had similar orders recently upheld by the North Carolina Court of Appeals and also in a related case in this district, *United States v. Bey*, No. 5:15-CR-166-BR, and (3) even if the court finds that the state court tracking orders lack probable cause, they are not so facially deficient as to preclude application of the good faith exception. *Id.*

In reply, Defendants argue that the state orders fail to meet the Fourth Amendment's particularity and specificity requirements as they allow GPS tracking of any telephones with which the target telephones communicate, the orders were issued upon a standard of less than probable cause, any reliance upon the orders was objectively unreasonable based on the factual deficiencies and lack of temporal proximity in the probable cause affidavits, and the court should not construe the orders to be warrants when the officers did not seek to obtain them as such.

Def. Sidbury's Reply [DE-163]. At the hearing, it became clear that the primary issues for determination are whether the state court tracking orders are the functional equivalent of warrants—specifically, whether they are supported by probable cause, and if not, whether the officers' reliance on the orders was objectively reasonable such that the good faith exception should apply.

In their joint supplemental brief, Defendants argue that the state court tracking orders are not supported by probable cause, primarily because the factual presentations misrepresented the source's reliability, only innocent details were corroborated, and there is no temporal proximity or factual nexus alleged. Joint Suppl. Br. [DE-203]. Additionally, Defendants argue that an objectively reasonable officer could not have relied upon the orders because they repeatedly state that they are issued upon a showing of less than probable cause and because they purport to authorize GPS tracking of any telephone that communicates with the target telephone number. *Id.* Defendants contend that severability cannot apply because (1) the severance analysis applies only where officers have sought a traditional warrant; (2) as the orders are not supported by probable cause, there is no valid portion of the orders to save through severance; (3) the "records and other information" section of the orders is not divisible to allow severance of the tracking of contacting telephones from the remainder of the section; and (4) even if the court determines that the authorization for tracking of contacting telephones is severable, that provision constitutes the greater weight of that section of the orders as it is both quantitatively dominant and qualitatively intrusive. *Id.* Finally, Defendants argue that each of the subsequent orders and warrants are fruits of the unconstitutional searches conducted under the first cell phone tracking order. *Id.*

In response, the Government contends that Defendants' argument asks the court to review the probable cause statements in an impermissible hyper-technical manner, and, when

7

viewed in their entirety, the probable cause statements do not misrepresent the reliability of the source, demonstrate that adequate corroboration was performed, are written in the present tense to suggest that the activity at issue is ongoing, and demonstrate a factual nexus between the phones and the information sought. Gov't Suppl. Br. [DE-213]. Additionally, the Government argues that Defendants improperly labeled several portions of the probable cause affidavits as conclusory and even if the court disregards certain portions of the probable cause affidavits, the good faith exception still applies. *Id.* Finally, the Government argues that severability should apply where the categories of information sought are not interrelated and the "records and other information" sought for the target telephone numbers can be severed from the contacting telephone numbers and the information sought for the target telephone numbers makes up the greater part of the warrant. *Id.* As to the fruit of the poisonous tree argument, the Government contends that GPS location information was not the cornerstone of the officers' investigative strategy in this case, and the same evidence would have inevitably been discovered through other investigative means even without the use of the GPS information. *Id.*

1.    **Factual Summary**

        *a.    Testimony of Lawrence Daniel*

Lawrence Daniel ("Daniel") testified as an expert in cell phone location technology for purposes of the suppression hearing. Hr'g Tr. Vol. I [DE-194] at 7-24. Daniel has worked in digital forensics for 15 years and testified about the different categories of cell phone location technology that were used by law enforcement to track Defendant Sidbury in this case. In terms of location tracking of cell phones, the least reliable method is historical cell-site location records or call detail records, which can only provide a cell phone's general location based upon which cell tower was used to connect a phone call or send a text message. A slightly more

specific method is protocol measurement data, which is able to provide information about how far a telephone is from a particular cell tower. Most pertinent in this case is the emergency 911 system ("E911"), which provides a range of precision location information as to a particular cell phone.

The Federal Communications Commission ("FCC") requires that carriers be able to provide the location of a cell phone within 300 feet 90 percent of the time and within 50 feet 67 percent of the time when a mobile call is placed to 911. In reality, the precision location reported using the E911 system varies greatly and can range from 10 to 15 feet to 200 to 300 feet. The E911 system must be specifically activated to connect with a phone to establish its location, and the method used to determine location varies from carrier to carrier. Carriers either send an electronic signal (a "ping") to the GPS microchip inside the phone to determine its location, or triangulate the phone's location by sending a radio signal using multiple (at least three) cell towers and measuring the time delay for the phone to respond by sending a radio signal back. Either method causes the phone to extend battery power, although the amount is not calculable, and a physical interaction is taking place within the phone.

In the normal course of business, the service provider does not collect and store the precise location of a cell phone. The E911 system is used to collect a phone's location only when the user calls 911 or when the 911 system is turned on to specifically locate a phone. The only time an individual user voluntarily discloses GPS location data to the service provider is when he or she calls 911. The phone must be powered on and with cellular service activated, so the E911 system cannot be used to track a phone that is turned off or outside of the service area. When the E911 system is turned on to locate a phone, location information is typically recorded every 15 minutes. When law enforcement has requested tracking of a particular phone, it is

9

provided in some type of automated fashion, whether by email or through a system which officers can access online. While the data is collected as of the time the E911 system communicates with the phone, there is a small delay in providing that information to law enforcement. Daniel also testified that the collection method for GPS tracking devices utilized on vehicles is very similar and law enforcement receives information in the same manner. Finally, the most accurate type of tracking utilizes an application that specifically tracks the individual phone using GPS location, such as the "Find My iPhone" application, which determines a phone's location in realtime once requested by a person using the application. This method is activated by individual users, however, and is not recorded by service providers. *Id.*

### b. *Testimony of Detective Heckman*

Detective Heckman testified about the process of obtaining and the use of the state court orders that authorized the GPS tracking of Defendants' cell phones in this case. Hr'g Tr. Vol. I [DE-194] at 66-157. Detective Heckman has 17 years of law enforcement experience with the Raleigh and Goldsboro Police Departments, and is dually sworn as a task force officer with the Federal Bureau of Investigation ("FBI") and the DEA. For the past eight years, he has worked long-term narcotics and money laundering cases which have been prosecuted in both state and federal courts.

Detective Heckman testified that this investigation began in late 2014, when he received information from a detective asking him to look into Defendant Sidbury as a possible drug trafficker, alleging that Defendant Sidbury was traveling to California to buy drugs and then distributing them in North Carolina. At the time the investigation began, the Raleigh Police Department had received three anonymous letters concerning Defendant Sidbury, and the same letters were also sent to the FBI, the DEA, and the United States Attorney's Office. These letters

stated that Defendant Sidbury, who uses the nicknames "Jay" and "Hollywood," lives at an address in Raleigh, travels to California to purchase drugs and ships them back to North Carolina for distribution, and that Defendant Sidbury does not work or pay taxes. The letters also provided information about the type and color of his vehicles, his phone numbers, and stash houses used by Defendant Sidbury to store drugs. When asked what steps he took to corroborate the information in these letters, Detective Heckman responded that officers reviewed the letters and verified the information, concluding that "obviously, the person who was providing the letters knew the person very well, knew [Defendant] Sidbury very well, intimately enough, you know, to provide details about his date of birth, his phone numbers and his vehicle information, his home address." *Id.* at 69.[1] However, officers have been unable to identify the person who sent the letter. Detective Heckman stated that after corroborating the information, his next step was to begin the investigation: "[w]e would travel out to his house, determine, you know, for one that the address listed in the letters was actually his address, checking with Johnston County tax records to confirm that he's the owner of the house, run DMV searches to confirm that he does own the cars that the—that the letter states and—and start conducting surveillance on him." *Id.* at 66-69.

Detective Heckman began conducting surveillance on Defendant Sidbury in December 2014 or January 2015, and at that point "believed that [Defendant] Sidbury was selling drugs and

---

[1] On redirect examination, Detective Heckman stated that he verified the cars driven by Defendant Sidbury, the addresses given, and the phone number (which was correct except for one digit). Hr'g Tr. Vol. I [DE-194] at 152-53. However, on re-cross examination, Detective Heckman admitted that none of the anonymous letters listed any phone numbers, and that information came from Agent Butler's notes taken during an anonymous call. Detective Heckman believed that officers found the correct number through banking records, specifically a signature card used to open a bank account obtained from a Detective Huger. Detective Heckman did not know how Detective Huger had obtained the bank records and did not know how current the information was. Detective Heckman believed the officers likely tried the phone number and believed it to belong to Defendant Sidbury when an adult male answered the phone, although he did not specifically have a conversation with Defendant Sidbury on that number. *Id.* at 152-56.

that he was traveling to California and that he was funneling the money back from his North Carolina based accounts into California based accounts." *Id.* at 69-70. Detective Heckman then decided to request an order from a North Carolina Superior Court Judge for one of Defendant Sidbury's phones (number 919-809-3016), hoping to get information that would "further corroborate the information and our beliefs to confirm that he was actually traveling maybe to the banks, that he was utilizing the addresses and the stash houses that the letter indicated that he was." *Id* at 70. According to Detective Heckman, when officers are looking for telecommunications information, with reasonable suspicion they can obtain a court order to receive phone records and subscriber information. However, once officers have probable cause to present to the judge, they can obtain a "pen order" that allows them to receive additional information, including location data. Detective Heckman wrote the application for the 919-809-3016 phone number, utilizing a template provided by attorneys who work for the North Carolina State Bureau of Investigation ("SBI"). Detective Heckman estimated that from December 2014 until April 2015, more than 20 such pen orders were presented to state court judges in the course of this investigation. Throughout his seven to eight years working with the FBI, Detective Heckman estimated that he has obtained over 500 similar orders (with minor variations due to developments in case law). These orders typically contain authorization for GPS information, however, Detective Heckman testified that officers do not actually obtain all of the information authorized by the pen orders. Officers usually start by asking for subscriber information, confirming whether the phone is in use, and looking at call detail records to make sure that the phone is being used by the correct target of their investigation. They ask for the pen order so that they have access to more information than they may make use of at the beginning of an investigation, so that when the phone number is confirmed they are able to proceed with the

investigation without having to pursue a second order allowing GPS tracking. Specifically, Detective Heckman stated that "[m]ost of the time, as a matter of fact, 95 percent of the time the pen order authorizes things that we don't ever want, that we never ask for, that we never intend to receive, and a lot of times, it's unnecessary, and often times, it's cost prohibitive." *Id.* at 69-74.

Detective Heckman obtained a pen order from a Wake County Superior Court Judge for phone number 919-809-3016 ("the first pen order") and used it to obtain GPS location information for that phone number. [DE-128-3]. The number was serviced by Sprint, which provides GPS location information to law enforcement through Lsite, a web portal that allows officers to track the target phone at 15 minute intervals. Detective Heckman identified Gov't Ex. 1 as the actual GPS location results obtained for phone number 919-809-3016 from December 3, 2014 until February 1, 2015 (printed with the most recent date first). The last line on the last page of Gov't Ex. 1 contains the first GPS ping collected from the target phone, which includes the time, the latitude and longitude, and a certainty factor of 592, meaning that the phone was located somewhere within 592 meters of the identified coordinate position. Detective Heckman testified that at times, the tracking was more precise, but he did not believe that it was ever so accurate as to allow officers to determine where inside a home an individual was standing. Despite the fact that the GPS tracking is considered to be realtime, it can take several minutes before officers receive the information about the phone's location. Detective Heckman testified that there were numerous periods of time (including one lasting from December 10th to the 19th and from January 10th until the order expired on February 1st) during the 60-day period authorized by the first pen order where Defendant Sidbury's phone was turned off or out of the service area, such that officers did not receive any location information. *Id.* at 75-81.

As to the provision in the first pen order that authorizes officers to receive GPS information about telephone numbers that contact the target phone number, when asked whether he would use such an order to obtain information about the contacting telephone numbers, Detective Heckman responded "[n]o. You cannot do that. It's not authorized and it's not something that's released by the phone companies." *Id.* at 81. Detective Heckman further stated that he did not intend to ask for GPS location information for contacting telephones with the first pen order, and that his department has never asked for GPS location information for a contacting telephone number under such a provision because it is not authorized and would not be provided by a phone company. Specifically, he stated "[w]e don't ask, because it would be denied. You have to provide another pen order under probable cause pertaining to that specific number and as to why—how it's involved in the case and what the probable cause is to actually track the phone." *Id.* at 83. When asked what information he could obtain as to contacting telephone numbers under the language contained in the first pen order, Detective Heckman responded that he could obtain subscriber information and phone records (which would include details about both outgoing and incoming calls). *Id.* at 81-83. On cross-examination, Detective Heckman again reiterated that he would not be able to use the state court tracking order to request GPS location information for contacting phone numbers, but would be able to obtain call detail records and subscriber information. *Id.* at 121-26.

Detective Heckman obtained an order authorizing installation of a pen register and trap and trace device from Magistrate Judge Numbers on April 21, 2015. Detective Heckman stated that he was seeking a pen register which would allow him to receive information about outgoing or incoming phone calls from two telephone numbers, including the cell tower and sector

utilized to initiate and terminate the call (cell site information).[2]  A pen register would not allow officers to access GPS location information, and Detective Heckman was not asking Magistrate Judge Numbers for separate authorization to obtain GPS or precision location information. After obtaining the order from Magistrate Judge Numbers, Detective Heckman sought another order in state court for the same two phone numbers.[3]  Detective Heckman testified that the service provider at issue charges between $2,000 to $3,000 to provision a pen register for 60 days. The officers wanted to ensure that the phones were actually on and in use before asking the service provider to activate the pen register, because the service provider charges the same amount regardless of whether the phone is being used, and this process took several days. Since the order from Magistrate Judge Numbers was signed several days earlier, the officers would not actually be obtaining 60 days worth of data and the subsequent state court pen order "refreshed" the date to activate the pen register. Detective Heckman testified that during the course of this investigation, he presented orders to every Superior Court Judge in Wake County, in addition to several visiting Superior Court Judges from other counties. *Id.* at 83-87, 89.

On cross-examination, Detective Heckman stated that service providers will not activate a pen register until law enforcement provides a CALEA sheet which directs the company where to send the information. When asked whether he could use the pen register order from federal court to determine whether a phone number was active, Detective Heckman responded that he could have, just as he would have also been able to do so with a state court pen order. Detective

---

[2] The application for a pen register and trap and trace device for phone numbers 323-788-9740 and 424-285-9766 and the resulting order signed by United States Magistrate Judge Numbers are contained in the record at DE-128-4. A pen register records information about outgoing or dialed calls, and a trap and trace device records information about incoming calls to the target numbers. *See* [DE-128-4] at 3-4.

[3] The application and resulting pen order signed on April 24, 2015 by Wake County Superior Court Judge Paul Gessner for the same phone numbers are contained in the record at DE-128-5.

Heckman stated that once officers confirmed that the phones were active, they then sought authorization from the DEA for funding for the pen register. Since several days had passed since the pen register order was signed, Detective Heckman then obtained a new order from state court to ensure they had access to the full 60 days of information. According to Detective Heckman, he was in the United States Attorney's Office discussing the case and decided to seek the pen register order in federal court as a matter of convenience since they were already in the federal courthouse. When asked why he could not simply use the federal pen register order to verify with the phone company that the phones were active and then go ahead and ask to activate the pen register the same day, Detective Heckman responded that he would still need to request funding from the DEA before activating the pen register, which would take several days. Detective Heckman stated that the information from the service provider about the phones being in use was provided over the phone, and he did not know whether paperwork was associated with the DEA funding requests as he was not involved in that process. When asked why he did not ask for GPS location information in the federal pen register application, Detective Heckman stated that he was only looking to provision a pen register on the numbers at that time, and even though the pen order obtained in state court several days later authorized GPS location information, he was not seeking location information. *Id.* at 87-96.

Detective Heckman was then asked on cross-examination about another pen register order signed on April 20, 2015 by Magistrate Judge Numbers (Def. Sidbury's Ex. 4) for phone number 919-780-7361. He did not recall whether he had previously used state court pen orders to track that same number, which was used by Defendant Sidbury. Detective Heckman then identified Def. Sidbury's Ex. 5 as a state court pen register order signed by Wake County Superior Court Judge Donald Stephens on February 10, 2015, authorizing the service provider to

release subscriber information, phone records, call detail records, pen register information, and GPS location information for phone numbers 919-780-7361 and 404-626-6163 for 60 days from the date of installation of the pen register (but no later than 10 days after the order was signed). Detective Heckman testified that he had presented probable cause to the judge and the resulting order authorized the release of all of that information, but that it was up to the officers' discretion as to what they actually requested from the service provider.

Detective Heckman confirmed that Def. Sidbury's Ex. 2 is a report of investigation signed by DEA Agent Dan Jones ("Officer Jones"), the subject line of which reads "Authorization and hanging of Federal Pen Register and Mobile Location on 919-780-7361." The report states that a federal pen register order for phone number 919-780-7361 was presented to and signed by Magistrate Judge Numbers on April 20, 2015, and that on April 22, 2015, Raleigh Police Detective Lawrence set up the pen register with the service provider and monitoring began. When asked whether the report undermined his earlier explanation of why a federal pen register order was followed by a state court pen order, Detective Heckman testified that he had not seen the report before the hearing and had not discussed its contents with Officer Jones. Further, another unit within the Raleigh Police Department actually installed the pen registers and monitored the incoming information, not Detective Heckman himself, and an Assistant United States Attorney is the signatory on the federal pen register application. When asked whether Officer Jones' report indicated that GPS monitoring began on April 22, Detective Heckman stated that he believed Officer Jones only provisioned the pen register since the report itself did not mention GPS location information.

While Agent Heckman's testimony on this point is unclear, he appears to state that if he had gone to state court instead of federal court to ask for a pen register, he would have asked for

17

the same information from state court, but the form order used by officers in state court simply authorizes the provision of additional information. When asked whether the last line of the federal pen register order that read "It is further ordered that nothing in this Order shall permit the FBI to receive triangulation information or location other than that transmitted at the beginning and end of particular calls or to place calls to the CELL PHONE repeatedly or otherwise to track on a continuous basis the location of the CELL PHONE when no call in [sic] being placed or received", [DE-128-4] at 12, prohibited officers from tracking the location of the telephones on a continuous basis, Detective Heckman stated that he was not asking to track the telephones based on GPS location information and the order simply summarized what information a pen register can and cannot provide. Further, when asked if he told Judge Gessner on April 24, 2015 that Magistrate Judge Numbers had previously prohibited continuously tracking the same telephone numbers, Detective Heckman responded that he did not recall whether he did, but did not believe he would have had to disclose that he had obtained an order from Magistrate Judge Numbers as he had not been denied anything he had requested. When asked if officers received GPS location information from the numbers involved in the April 21, 2015 federal pen register order, Detective Heckman did not know whether they had but stated that if GPS location information was obtained, it would not have been in violation of Magistrate Judge Numbers' order as it would have been obtained pursuant to a pen order by a different judge. *Id.* at 96-121.

Additionally on cross-examination, Detective Heckman confirmed that Def. Sidbury's Ex. 6 contains the three anonymous letters that prompted the investigation into Defendant Sidbury and admitted that Defendant Sykes' name or address is not mentioned in any of the

letters.[4] In the probable cause section of the application for a state court pen order in Def. Sidbury's Ex. 5, Detective Heckman describes the source of information as a "confidential source," but admitted at the hearing that the individual is really an anonymous tipster. When asked where he obtained information about Defendant Sykes, Detective Heckman stated "I think she was developed as [a] suspect based on watching [Defendant] Sidbury go to First Citizens Bank, and then—subpoenaed First Citizens Bank to find out who the account holder was that he was depositing money into and then determined her address[.]" *Id.* at 127. When pressed further, Detective Heckman stated that there was an ongoing DEA investigation into Defendant Sidbury, and Agent John Butler provided him with information about an anonymous caller who stated that Defendant Sykes was receiving packages for Defendant Sidbury. Detective Heckman did not know when the anonymous letters were received, but believed that one could be as much as 5 or 10 years old. Detective Heckman has not been able to determine who sent the letters, even though he believes they were tested for DNA and fingerprinted. He also did not know when Agent Butler spoke with the anonymous caller, but knew that Agent Butler had received the call shortly before speaking with the Raleigh Police Department officers. The anonymous caller used a private line and Agent Butler was not able to identify the caller. Agent Butler took some notes during the phone conversation which matched much of the information received in the anonymous letters. When asked whether he verified a statement in the first anonymous letter that Defendant Sidbury had a tractor-trailer bringing in 1,000 pounds of marijuana every month, Detective Heckman admitted that this statement was not verified prior to the investigation, but

---

[4] Def. Sidbury's Ex. 6 contains four letters, but the fourth (which is preceded by a fax cover sheet) was received via fax on June 4, 2015, well after the investigation into Defendant Sidbury had begun. Hr'g Tr. Vol. I [DE-194] at 142; Def. Sidbury's Ex. 6 at 4-5.

that another federal inmate confirmed that information after Defendant Sidbury was arrested. Detective Heckman stated that he linked Defendant Sidbury to another suspect member of the drug organization who owned a trucking company, but did not verify the existence of a tractor-trailer or thousands of pounds of marijuana. *Id.* at 126-32.

As to Defendant Sykes, Detective Heckman identified DE-129-1 as an application and resulting state court pen order for Defendant Sykes' phone signed by Wake County Superior Court Judge Gessner on June 9, 2015, authorizing officers to obtain historical and prospective tracking, subscriber information, call detail records, and GPS location information for both Defendant Sykes' phone and any contacting phones. The probable cause affidavit for this pen order stated that officers obtained a federal search warrant on June 9, 2015 for Defendant Sykes' home. However, Defendant Sykes' home was not actually searched until June 22, 2015, pursuant to a second federal search warrant signed on June 19, 2015, after officers tried to execute the first warrant on June 9, 2015 but Defendant Sykes was not at home. Detective Heckman did not recall the date of the warrants, but remembered that officers had obtained two warrants for Defendant Sykes' home. The officers treated this search warrant as a document search warrant, and sought to execute it while Defendant Sykes was at home. Officers were not able to execute the first warrant before it expired, and Detective Heckman believed that officers used information from cell tower analysis to determine that Defendant Sykes was in California. Detective Heckman believed that only one pen order was sought for Defendant Sykes' phone, and did not believe that any GPS location information was obtained for her phone. As to the anonymous letters, Detective Heckman did not know whether they arrived in envelopes and did not seek to obtain them, as it was not his role in the investigation. *Id.* at 132-45.

### c.     *Testimony of Sergeant Pennica*

Sergeant Pennica testified regarding the timing of the anonymous tips about Defendant Sidbury that were received by the Raleigh Police Department. Hr'g Tr. Vol. II [DE-210] at 221-36. Sergeant Pennica supervises the unit of five officers within the Raleigh Police Department that investigates drug trafficking and money laundering cases. Sergeant Pennica recalled an anonymous letter about Defendant Sidbury received by the department in 2005. Sergeant Pennica testified that he remembered how the letter was written and that it discussed Defendant Sidbury, who was known to have been arrested for murder a couple of years before. Detectives within the department shared the letter internally, but to Sergeant Pennica's recollection, no one opened an investigation into Defendant Sidbury at that time. *Id.* at 221-22.

Then in October 2014, Agent Butler received an anonymous phone call from a female reporting information about Defendant Sidbury. The DEA reported this call to the Raleigh Police Department. Sergeant Pennica admitted on cross-examination that Agent Butler's notes of the phone conversation, Def. Sidbury's Ex. 3, do not contain the date of the call and any information about the timing is based on his memory. Around this same time, in October or November 2014, the homicide department received another letter describing Defendant Sidbury's involvement with drug dealing and according to Sergeant Pennica, this letter was written similarly to the 2005 letter. Sergeant Pennica identified the letter received by the homicide unit as the second page of Def. Sidbury's Ex. 6. Other letters began surfacing from the FBI and the United States Attorney's Office. Sergeant Pennica believed either the first or third page of Def. Sidbury's Ex. 6 was the letter received by the FBI. After Defendant Sidbury was arrested in this case, another letter was sent by fax to the Raleigh Police Department's Crime Stoppers unit in June of 2015, which is contained in the record as the last two pages of Def.

Sidbury's Ex. 6. Sergeant Pennica did not believe that Def. Sidbury's Ex. 6 contained the letter from 2005. Sergeant Pennica admitted on cross-examination that none of the letters or handwritten notes from Agent Butler contained information stating that Defendant Sykes was receiving marijuana packages for Defendant Sidbury, despite the December 3, 2014 application for a pen order representing such.

## 2.    Analysis

### *a.    Standing*

As an initial matter, while neither party has addressed this issue, the undersigned must first determine the scope of each defendant's Fourth Amendment challenge. Fourth Amendment rights "are personal in nature and 'may not be vicariously asserted.'" *United States v. Rumley*, 588 F.3d 202, 206 n.2 (4th Cir. 2009) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (internal quotation marks omitted) (citing *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988)). "In order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a 'legitimate expectation of privacy' in the invaded place." *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (quoting *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010)). "[A] defendant has no standing to challenge the admission of evidence illegally obtained from co-conspirators." *Wilford*, 961 F. Supp. 2d at 757 (citing *United States v. Padilla*, 508 U.S. 77, 82 (1993) (per curiam) (overturning a co-conspirator exception to the rule that each defendant must have a legitimate expectation of privacy in order to raise a Fourth Amendment challenge)); *see also Alderman v. United States*, 394 U.S. 165, 172 (1969) ("Co-conspirators and codefendants have been accorded no special standing."). Thus, "[a] search can therefore be unconstitutional with respect to one person, yet the evidence obtained therefrom admissible against a second person." *United States v. Gray*, 491 F.3d 138,

144-45 (4th Cir. 2007). In order to show a legitimate expectation of privacy in an object, a defendant must have a either a property interest or possessory interest in that object. *United States v. Carter*, 300 F.3d 415, 421 (4th Cir. 2002) ("A passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest . . . ."). Accordingly, each defendant in the instant case only possesses standing to challenge the GPS tracking of his or her individual cell phones. *Accord Wilford*, 961 F. Supp. 2d at 757-58 (holding that the defendant "lack[ed] standing to challenge the pinging of any cell phone, other than his own.").

### b. *Probable Cause*

The parties agree that the law enforcement officers in this case were required to show probable cause in order to obtain the GPS location information from Defendants' cell phones, but disagree about whether the state court orders that authorized GPS location tracking were the functional equivalent of search warrants supported by probable cause. The undersigned notes, however, that the Fourth Circuit has not squarely addressed the issue of whether probable cause is required to obtain GPS location information from a cell phone, but it has suggested that probable cause would be required. *See United States v. Graham*, — F.3d —, —, 2016 WL 3068018, at *10 (4th Cir. 2016) (en banc) (applying the third party doctrine and holding that probable cause was not required to obtain historical cell site location information ("CSLI") where that information was collected and maintained in the regular course of business by cell phone providers in the course of providing cellular service to customers, noting that the defendants "attemp[ed] to apply the same constitutional requirements for location information acquired directly through GPS tracking by the <u>government</u> to historical CSLI disclosed to and

23

maintained by a <u>third party</u>.")[5]; *United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. Nov. 21, 2013) (unpublished) (per curiam) (determining that probable cause supported the issuance of a search warrant which authorized GPS location monitoring of a defendant's cell phone); *see also Wilford*, 961 F. Supp. 2d at 772 (assuming *arguendo* that repeated GPS pinging of the defendant's cell phone constituted a Fourth Amendment search). At least one district court within the Fourth Circuit has held that cell phone GPS location information is covered by the Fourth Amendment. *See In re Application of U.S. for an Order Authorizing Disclosure of Location Information of a Specified Wireless Telephone*, 849 F. Supp. 2d 526, 543 (D. Md. 2011) (holding that the government's request to obtain GPS location pings from a defendant's cell phone for a 30-day period constituted a Fourth Amendment search). *But see United States v. Skinner*, 690 F.3d 772, 777-81 (6th Cir. 2012) (holding that the defendant did not have a reasonable expectation of privacy in GPS location data collected from his cell phone, but relying heavily on the fact that the GPS location data was only collected for three days and occurred while he was traveling on public thoroughfares where officers could have physically surveilled him).

Here, it is assumed *arguendo* that the collection of GPS location information from Defendants' cell phones constitutes a search for Fourth Amendment purposes. Additionally, if probable cause exists, it is not material whether the applications were for orders as opposed to warrants. *See Wilford*, 961 F. Supp. 2d at 773 ("That the pinging applications were for an 'Order,' as opposed to a 'Warrant,' is not material.") (citing *Dalia*, 441 U.S. at 256-59 (holding

---

[5] Here, where Daniel testified that celllphone service providers do not collect and store GPS location data about cell phones in the normal course of business, Hr'g Tr. Vol. I [DE-194] at 10, the third party doctrine would not apply. *See Graham*, 2016 WL 3068018, at *4 (holding that historical CSLI was not protected by the Fourth Amendment where the defendants exposed that information to the service providers' equipment in the ordinary course of business and that information was recorded in the normal course of providing phone service to defendants).

that a court order authorizing a wiretap "was a warrant issued in full compliance with . . . traditional Fourth Amendment requirements" and was supported by probable cause)). As Defendants argue that officers in this case used unconstitutionally-collected GPS location data to build their investigation, the analysis must begin by addressing whether the first pen order [DE-128-3] was the functional equivalent of a warrant supported by probable cause.

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures, and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has interpreted the Fourth Amendment to establish only three requirements for warrants: (1) they must be issued by neutral, disinterested magistrates; (2) supported by probable cause; and (3) particularly describe the place to be searched and the things to be seized. *Dalia*, 441 U.S. at 256 (citations and quotations omitted). Probable cause is "not defined by bright lines and rigid boundaries[,]" but instead "allows a magistrate to review the facts and circumstances as a whole and make a common sense determination of whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[P]robable cause is a flexible, common-sense standard . . . . [that] merely requires that the facts available to the officer would 'warrant a man of reasonable caution'" to believe that evidence of a crime may be discovered and does not require "any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)); *see also Williams*, 974 F.2d at 481. Sufficient information must be presented to the magistrate to allow for the exercise of independent judgment; the magistrate

cannot simply ratify the bare conclusions of others. *Gates,* 462 U.S. at 239. "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996) (citing *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990)). Further, as to particularity, "[t]he Fourth Amendment requires that a warrant be 'no broader than the probable cause on which it is based.'" *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (quoting *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (internal quotation marks omitted)). "The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant. *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (citation omitted).

Since probable cause is evaluated through a "totality of circumstances" analysis and based on a person's common sense, great deference is accorded to a magistrate's assessment of the facts before him. *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (citing *Gates*, 462 U.S. at 230; *Blackwood*, 913 F.2d at 142). The court's review is therefore limited to whether there was a "substantial basis for determining the existence of probable cause." *Id.* (quoting *Gates*, 462 U.S. at 239). The court will not invalidate a search warrant "by interpreting [an] affidavi[t] in a hypertechnical, rather than commonsense, manner." *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993) (quoting *Gates*, 462 U.S. at 236).

In the Fourth Circuit, "[i]t is well settled that probable cause may be founded upon hearsay and information received from informants[,]" but "there is no bright-line rule as to when such information may establish probable cause . . . ." *United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004) (citing *Franks v. Delaware*, 438 U.S. 154, 165 (1978)). "In assessing

whether an officer acting on an informant's tip has probable cause, we look to the 'totality of the circumstances' surrounding the information available to the officer." *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991) (quoting *Gates*, 462 U.S. at 213)). Part of this assessment requires consideration of the "'veracity' and 'basis of knowledge' of persons supplying hearsay information[.]" *Gates*, 462 U.S. at 238 (discussing how an anonymous letter, standing alone, provided no information to determine the author's honesty, the reliability of his or her information, or the basis for his or her knowledge about the alleged criminal activity). Further, in reviewing whether probable cause exists "the degree to which the report is corroborated is an important consideration." *Wilhelm*, 80 F.3d at 119 (citing *Lalor*, 996 F.2d at 1581); *Miller*, 925 F.2d at 698 ("An informant's tip is rarely adequate on its own to support a finding of probable cause."). Additionally, the type of details provided in the informant's information factor into the analysis as well. *Gates*, 462 U.S. at 245 (differentiating between "easily obtained facts and conditions existing at the time of the tip, [and] future actions of third parties ordinarily not easily predicted."). However, there is no requirement that officers must "corroborate [the] tip in some specific way such as conducting an independent investigation" because such a rigid requirement would contravene the flexible totality of the circumstances approach in determining probable cause. *Miller*, 925 F.2d at 699-70 (citing *Gates*, 462 U.S. at 230).

Ultimately, courts have determined that probable cause existed where there was something presented to the magistrate beyond a bare bones affidavit that provides no indication of the tipster's truthfulness or reliability. *Compare Wilhelm*, 80 F.3d at 121 (determining that an affidavit did not establish probable cause and refusing to apply the good faith exception where the affidavit was based on information provided in an anonymous phone call, provided no indication of the tipster's truthfulness or reliability, the only corroboration provided to the

magistrate was verification of the tipster's directions to the defendant's home, and there was no basis for the officer's statements in the affidavit that the tipster was a mature concerned citizen with personal connections to the suspects), *with Lalor*, 996 F.2d at 1581 (holding that there was a substantial basis for finding two confidential informants reliable where one of the informants stated that she had bought drugs from the defendant on multiple occasions, one informant described defendant's car, both informants provided specific facts about the defendant's alias, address, and the area in which he operated and thus corroborated each other's information, officers corroborated these details through independent police investigation, and the defendant was arrested for possessing drugs five days prior to the issuance of the warrant, but determining that probable cause was lacking where there was no nexus provided to link defendant's drug activity to the place that was searched, and ultimately applying the good faith exception). *See also United States v. Powers*, 1 F. Supp. 3d 470, 477 (M.D.N.C. 2014) (holding that there was no substantial basis to determine an informant's reliability even though the informant was not anonymous where the individual was untested and of unknown reliability, the information provided was vague where the informant claimed to have seen unknown quantities of drugs in a residence and did not mention packaging details or where in the home the drugs were located, and corroboration by officers was minimal and unrelated to illegal activity where they only confirmed that another individual was located inside the home, and refusing to apply the good faith exception, particularly noting that the description of the informant as reliable was unsupported); *United States v. Davis*, 939 F. Supp. 2d 535, 561-62 (E.D.N.C. 2013) (determining that probable cause was lacking where the affidavit failed to include any information establishing the basis of the individual's knowledge of fraudulent activity and stolen property

and officers performed no corroboration of the information provided, but ultimately applying the good faith exception).

Additionally, "there is no question that time is a crucial element of probable cause." *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984). "A valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *Id.* at 1335-36 (quoting *Sgro v. United States*, 287 U.S. 206, 210-11 (1932) (further citations omitted)). "[E]vidence seized pursuant to a warrant supported by 'stale' probable cause is not admissible in a criminal trial to establish the defendant's guilt." *Id.* at 1136. In addition to the situation where law enforcement's delay in executing a warrant potentially taints a search, "the warrant itself may be suspect because the information on which it rested was arguably too old to furnish 'present' probable cause." *Id.* (citations omitted). In the second instance, the reviewing court's task is to "determine whether information sufficient to constitute probable cause was ever presented." *Id.* Factors for consideration include "the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.* (citing *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)). An affidavit that provides no information about when the alleged criminal activity occurred is insufficient to demonstrate probable cause. *See United States v. Doyle*, 650 F.3d 460, 474 (4th Cir. 2011) (holding that, in a child pornography case where the defendant showed a nude photograph to a child and that date was omitted from the affidavit and not provided to the magistrate, "it was unreasonable to believe that probable cause was demonstrated to search Doyle's home given the complete absence of any indication as to when the pictures were possessed."); *United States v. Carroll*, No. 7:12-CR-57-F, 2012 WL 3780449, at \*4 (E.D.N.C. Aug. 31, 2012) (unpublished) (holding that probable cause was lacking where an

affidavit provided dates an informant spoke with police but omitted any information about when the underlying criminal activity occurred); *see also United States v. Anderson*, 851 F.2d 727, 729-30 (4th Cir. 1988) (explaining that the relevant time period for determining probable cause is measured from the date of the underlying criminal activity, not when the information was provided to law enforcement). "[I]n cases in which an affidavit provides evidence of an ongoing criminal enterprise, evidence that otherwise would be 'stale' can provide a sufficient basis for a finding of probable cause." *Carroll*, 2012 WL 3780449, at \*5 (citations omitted); *see also McCall*, 740 F.2d at 1336-37 (collecting cases allowing longer time periods between observation of the alleged criminal activity and issuance of a warrant where law enforcement had evidence of an ongoing criminal enterprise); *accord Lalor*, 996 F.2d at 1582 (rejecting a staleness argument where the affidavit was written in the present tense, suggesting the drug activity was ongoing and the defendant was arrested for drug possession five days prior to issuance of the warrant, allowing the magistrate to reasonably infer that drug activity was ongoing, but cautioning that "a time frame should have been disclosed.").

Here, the affidavit contained in the application for the first pen order states as follows:

> I, Detective Keith Heckman with the Raleigh Police Department am conducting a drug investigation on John Sidbury. The Raleigh DEA office received information from a confidential source that John Sidbury is involved in trafficking large amounts of marijuana in Raleigh and Wilmington. This Informant provided very detailed information concerning John and his operation. This person is likely an ex-girlfriend of Sidbury based on the information provided. The informant indicated that John Sidbury travels to California twice per month to purchase marijuana and ships it back to Raleigh via USPS. The informant indicated that the packages are usually delivered to "Kisha" (identified at [sic] Lakisha Denise Robbins), to his sister Yolanda Sidbury Martin or to Eliabeth [sic] Sykes of [redacted] in Raleigh. The names and addresses of the above listed females have been verified through surveillance and research of police databases.

Additionally, this CI provided Sidbury's current address of [redacted] Raleigh and provided multiple phone numbers for him. The primary number provided was one digit off from the number in this order. The CI provided 919 806-3016, and the correct number has been verified to be: 919 809-3016. This number is serviced by SPRINT PCS.

This same CI also indicated that Sidbury drives an older Lexus, a newer Chevy Pick Up truck, a BMW and a new Honda Accord. Research of the DMV database confirms that John Sidbury does have all of the above listed vehicles registered in his name.

Additional information has been developed that Sidbury is structuring large cash deposits into Wells Fargo Bank. I am in the process of obtaining Sidbury's banking information. Sidbury is also a suspect in a cold case Raleigh Homicide.

[DE-128-3] at 1-2. No testimony was offered at the hearing that Detective Heckman presented any other information to Judge Young (who signed the first pen order) other than what was contained in the application, and only the information presented to Judge Young may be considered in reviewing whether probable cause existed. *Wilhelm*, 80 F.3d at 118. Detective Heckman's affidavit provides no substantial basis for a finding of probable cause for three reasons: (1) there is no information from which to determine the anonymous tipster's basis of knowledge or veracity and minimal corroboration took place; (2) there is no temporal information given in connection with the alleged underlying criminal activity; and (3) the resulting order does not meet the particularity requirement where it authorizes collecting information about telephones that contact the target phone number.

Despite describing the source of information in his affidavit as a confidential source and a confidential informant, Detective Heckman admitted at the hearing that the individual was actually an anonymous tipster. Hr'g Tr. Vol. I [DE-194] at 127. Further, while the affidavit states that the tipster is likely an ex-girlfriend of Defendant Sidbury's, there is no basis for that conclusion. This is similar to the affiant in *Wilhelm*, who described an anonymous tipster as a

reliable source and a mature, concerned citizen, with personal connections to the defendant and who projected a truthful demeanor. 80 F.3d at 118. The *Wilhelm* court noted that "[t]he conclusion that an informant is reliable and mature based only on brief telephone conversations is dubious, and the affidavit does not disclose any basis for [the officer's] conclusion that her tipster was a 'concerned citizen.'" *Id.* at 121. Further, the court stated that the use of these phrases "[w]hile perhaps not undertaken with deliberate bad faith . . . strike the court as attempts to endue the affidavit with the appearance of genuine substance; this tactic suggests that [the officer] herself knew that probable cause was lacking, and thus that reliance on the resulting warrant was not reasonable." *Id.* at 123. Here, both the description of the anonymous tipster as a confidential source and a confidential informant and the conclusion that she was likely an ex-girlfriend of Defendant Sidbury's are unsupported. Further, the anonymous tipster's reliability is undercut where the phone number she provided for Defendant Sidbury was not actually the correct phone number. Thus, the information presented in the affidavit provides no basis to determine whether the tipster is reliable.

Additionally, there is no basis in the affidavit to determine how the anonymous tipster knew about the alleged criminal activity of drug trafficking. In contrast, in *Lalor*, probable cause existed where one confidential informant described purchasing drugs from the defendant on multiple occasions, and both informants provided specific facts about the defendant's alias, address, and area in which he operated, thereby corroborating each other's information. 996 F.2d at 1581; *see also Davis*, 939 F. Supp. 2d at 561-62 (holding that an affidavit failed to establish probable cause where it included no information about the basis of the individual's knowledge of fraudulent activity and stolen property and simply stated that the individual believed the items to be stolen based on his experiences). Similarly here, the affidavit fails to

32

state how the anonymous tipster obtained knowledge of Defendant Sidbury's drug trafficking activities.

While the affidavit in the instant case describes some corroboration undertaken by law enforcement, this corroboration is minimal at best. In the affidavit, Detective Heckman states that the names and addresses of three females who allegedly received shipments of marijuana from Defendant Sidbury were verified through surveillance and research of police databases, but only one address is actually listed in the affidavit. [DE-128-3] at 1 ("The informant indicated that the packages are usually delivered to 'Kisha' (identified at [sic] Lakisha Denise Robbins), to his sister Yolanda Sidbury Martin or to Eliabeth [sic] Sykes of [redacted] in Raleigh."). By stating that the tipster provided Defendant Sidbury's current address, Detective Heckman appears to be stating that he corroborated that information as well. Detective Heckman also states that he confirmed via the DMV database that Defendant Sidbury has the vehicles identified by the anonymous tipster registered in his name. Although Detective Heckman states that Defendant Sidbury's phone number was verified to be one digit removed from the number provided by the anonymous tipster, this fails to constitute substantial corroboration where the underlying information was incorrect. Thus, the corroboration discussed on the face of the affidavit was at best verification of the addresses of the three females identified as receiving packages for Defendant Sidbury, and verification of Defendant Sidbury's address and his registered vehicles. While "[c]orroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct[,]" here, the minimal corroboration was insufficient given the lack of information about the anonymous tipster's basis of knowledge and reliability. *Lalor*, 996 F.2d at 1581 (citing *Gates*, 462 U.S. at 244 (internal citations omitted)). Further, these details are "easily obtained facts and conditions existing at the

time of the tip," not future predictive actions. *Gates*, 462 U.S. at 245. While corroboration of the defendant's address, vehicle, and alias was sufficient in *Lalor*, that was in combination with the fact that both informants bolstered each other's stories, one informant described buying drugs from the defendant on multiple occasions, and the defendant was arrested five days prior for drug possession. 996 F.2d at 1581. In the instant case, this minimal corroboration of static, innocent details combined with the lack of any information about the anonymous tipster's basis of knowledge and reliability is insufficient to support a finding that there was a substantial basis to determine that probable cause existed.

Additionally, the affidavit is devoid of any information about when the drug trafficking activities were taking place or even when the anonymous tip was provided. *See Anderson*, 851 F.2d at 729-30 (the relevant time period for determining probable cause is measured from the date of the underlying criminal activity, not when the information was provided). In *Lalor*, the court was able to excuse the absence of any time frame where the affidavit alleging the defendant was selling drugs was written in present tense and the defendant had been arrested for drug possession five days prior to issuance of the warrant. 996 F.2d at 1582. Here, however, while the affidavit is written in the present tense, there is no time frame included whatsoever. Further, while the affidavit mentions that Defendant Sidbury is structuring cash deposits and is a suspect in a cold case homicide, again there is no time period linked with the alleged structuring and being a suspect in a cold case homicide is not necessarily linked to drug trafficking, which is the criminal activity alleged in the warrant. *See Davis*, 939 F. Supp. 2d at 562 ("Learning whether . . . [the defendant] had a criminal history relative to the crimes alleged in the search warrant affidavit, could have been helpful to verify [the informant's] reliability.") (citations omitted); *see also United States v. Bynum*, 293 F.3d 192, 197-98 (4th Cir. 2002) ("An officer's

report in his affidavit of the target's prior criminal activity or record is clearly material to the probable cause determination[.]") (internal quotations and citations omitted); *Powers*, 1 F. Supp. 3d at 475 ("Facts related to one crime, drug possession, cannot justify a search warrant for evidence of the entirely different crime of drug trafficking.") (citations omitted). Thus, where no time frame is mentioned and there is no date of similar criminal activity with which to link the anonymous tipster's claims of current illegal activity, the affidavit fails to provide probable cause.

Turning to the Fourth Amendment's particularity requirement, the first pen order provides as follows:

> the "records and other information" sought pursuant to 18 U.S.C. §2703(d) for **919 809-3016** and other telephones, of whatever type, with which **919 809-3016** communicates includes records such as all published and non published subscriber records for incoming calls received or outgoing numbers dialed, telephone toll and direct connect records, cellular tower and originating cell site information to include towers, switches, historical and prospective Global Positioning Location (GPS) for the duration of the order, real time call detail records with coordinating real time cell site location information, historical call detail records to include cell site location information . . . and any other relevant information pertaining to telephone numbers associated with the telephones, digital display devices, and mobile telephones utilized[.]
>
> **"THEREFORE, IT HAS BEEN DETERMINED THAT PROBABLE CAUSE EXISTS AND IT IS HEREBY ORDERED** . . . . [that providers of electronic communications services] shall disclose to the Raleigh Police Department, SBI or **any other applying officer** all published and non-published subscriber records and account billing information to include account notes for incoming calls received or outgoing numbers dialed, telephone toll and direct connect records, cellular tower and originating cell site information to include towers, switches, Global Positioning Location (GPS), real time call detail records with coordinating real time cell site location information, and other information relevant to **919 809-3016** and other telephones of whatever type with which **919 809-3016** communicates . . . .

[DE-128-3] at 5-6. This provision authorizes the collection of a range of information, up to and including GPS location information about telephones which simply contact the target phone

number. There is nothing here to show the "relation to designated crimes" of every single telephone which may contact the target phone number during the time period at issue. *Williams*, 592 F.3d at 519. The overbreadth of this provision certainly fails the Fourth Amendment requirement "that a warrant be 'no broader than the probable cause on which it is based.'" *Hurwitz*, 459 F.3d at 473 (quoting *Zimmerman*, 277 F.3d at 432). Thus, the first pen order also fails for lack of particularity.

Accordingly, where there is no basis on which to determine the anonymous tipster's reliability or basis of knowledge, minimal corroboration was performed, and no time frame is provided for the alleged criminal activity, there is no substantial basis to determine that probable cause exists to support the first pen order, and it is also invalid for lack of particularity where the order authorizes the collection of information about telephones which contact the target phone without an individualized showing of probable cause as to those telephones.

    *c.*   ***Good Faith Exception***

"Historically, the remedy for Fourth Amendment search violations has been the exclusion of evidence collected pursuant to the search." *United States v. Carroll*, No. 7:12-CR-57-F, 2012 WL 5350364, at \*5 (E.D.N.C. Oct. 28, 2012) (unpublished) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961); *Weeks v. United States*, 232 U.S. 383 (1914)). "However, a number of recent United States Supreme Court decisions . . . . held that exclusion should be a 'last resort'—and only invoked where the deterrent effect on police conduct outweighs the substantial social costs associated with excluding evidence in a criminal trial." *Id.*; (citing *Herring v. United States*, 555 U.S. 135, 140 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system"); *Hudson v. Michigan*, 547 U.S.

586, 591 (2006) (further citations omitted)). Additionally, "*Leon* teaches that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Bynum*, 293 F.3d at 195 (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)).

Defendants argue that the good faith exception should not apply here where officers sought an order and not a warrant. In response, the Government contends that the officers were acting with an objectively reasonable good faith belief that their conduct was lawful, and there is no deterrent effect gained here by excluding reliable evidence. The *Leon* good faith exception applies to warrants and recognized exceptions to the warrant requirement. *See Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990) (applying the good faith exception after noting the general rule that officers act must reasonably and "see[ing] no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search."); *United States v. Moss*, 963 F.2d 673, 677 (4th Cir. 1992) ("[N]othing in *Rodriguez* suggests that the good faith exception extends even beyond the generally recognized exceptions to the warrant requirement: i.e., beyond consent, or one of the various forms of exigency that have been recognized depending upon the purpose of a search."). The Fourth Circuit has not addressed the issue of whether the good faith exception applies to orders characterized as the functional equivalent of warrants. *Cf. United States v. Patrick*, No. 13-CR-234, 2015 WL 106158, at *3, 7 (E.D. Wis. Jan. 7, 2015) (unpublished) (holding that probable cause supported a state court order authorizing installation and use of a trap and trace device and a pen register device and the release of CSLI for a target phone such that the order was a functional equivalent of a warrant, and declining to address the alternative argument that the good faith exception saved the order,

but stating "considering the unsettled nature of this area of law, it seems certain that the exception would apply."). Assuming *arguendo* that the good faith exception can apply to warrant equivalents, it is not appropriately applied under the circumstances presented here for the reasons that follow.

There are four situations in which an officer cannot be found to have acted with "objective reasonableness" such that the good faith exception does not apply:

> (1) the magistrate . . . was mislead by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

> (2) the magistrate acted as a rubber stamp for the officers and so wholly abandoned his detached and neutral judicial role;

> (3) an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

> (4) a warrant [is] so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Bynum*, 293 F.3d at 195 (internal quotation marks omitted) (quoting *Leon*, 468 U.S. at 923). As to the third situation, *Leon* is clear that the standard is "a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." *Id.*

In *Wilhelm*, the court applied the third exception in refusing to apply the good faith exception:

> [The officer] could not reasonably rely on an unknown, unavailable informant without significant corroboration. Because [the officer] presented to the magistrate nothing more than this unreasonable reliance, the Supreme Court's third exception to *Leon* applies: the affidavit here did not "provide the magistrate with a substantial basis for determining the existence of probable cause." While perhaps not undertaken with deliberate bad faith, [the officer's] use of phrases such as "concerned citizen," "mature" and "truthful demeanor" strike this court as

38

> attempts to endue the affidavit with the appearance of genuine substance; this tactic suggests that [the officer] herself knew that probable cause was lacking, and thus that reliance on the resulting warrant was not reasonable. In addition, the state magistrate appears to have acted as a rubber stamp in finding this affidavit sufficient to establish probable cause.

*Wilhelm*, 80 F.3d at 123; *see also United States v. Perez*, 393 F.3d 457, 465 (4th Cir. 2004)

("[I]n *Wilhelm* we concluded that the magistrate, in concluding that this take-my-word-for-it affidavit established probable cause, essentially shirked his duty to act independent of law enforcement and acted as a rubber stamp.") (internal quotations omitted). Similarly, here, Detective Heckman presented an affidavit containing the vague allegations of an anonymous tipster without significant corroboration. While there is no evidence that the mischaracterization of the anonymous tipster as a confidential source and a confidential informant rises to the level of deliberate bad faith to justify application of the first exception, this puffing suggests that Detective Heckman knew that reliance on the resulting order was not reasonable. *See Wilhelm*, 80 F.3d at 123.

Additionally, this case is distinguishable from other cases where the courts have found that the officers' reliance was objectively reasonable. *See, e.g.*, *Lalor*, 996 F.2d at 1583 (holding that the warrant was not so lacking in probable cause to render the officer' reliance objectively unreasonable, but as discussed above, significantly more corroboration was performed and two informants provided similar information); *see also Davis*, 939 F. Supp. 2d at 542 (holding that officers' reliance was not objectively unreasonable based on the information provided in the affidavit and the fact that the officer spoke with the individual in person, allowing the officer to judge his credibility, and distinguishing the case from *Wilhelm*'s unnamed informant with no indica of truthfulness or reliability). While in *Lalor* the court found that disagreement among judicial officers as to the existence of probable cause weighed in favor of objective

reasonableness and the Government repeatedly makes that argument here, this quote is taken out of context in consideration of the first pen order. In *Lalor*, the Fourth Circuit considered a warrant that both the issuing magistrate and the district court found to be supported by probable cause. 996 F.2d at 1583 ("Indeed, two judicial officers have determined that the affidavit provided probable cause to search.") (citing *Leon*, 486 U.S. at 926 (noting that disagreement among judges as to the existence of probable cause weighs in favor of objectively reasonable reliance)). The Government points to the fact that multiple Wake County Superior Court Judges signed pen orders in this case in support of its argument that the officers' reliance on them was objectively reasonable. However, as to the first pen order, only one judge made a probable cause determination, therefore, the Government's argument is misplaced. While the fact that many different judges repeatedly signed similar pen orders over the course of this investigation weighs in favor of applying the good faith exception, the other problems discussed above are too numerous and heavily weigh against its application. The facts of this case instead align closely with the facts in *Wilhelm*, where here the affidavit contains information provided by an anonymous tipster with minimal corroboration and no information on which to determine the tipster's veracity or basis of knowledge. Thus, the third exception precluding application of the good faith exception would apply here where reliance on the resulting order was not objectively reasonable.

Moreover, the Fourth Circuit has also held that "where the totality of the information provided to the magistrate included no indication as to when the events supposedly creating probable cause to search took place, we cannot conclude that the officers reasonably relied on the resulting search warrant." *Doyle*, 650 F.3d at 475 (internal footnote and citations omitted); *accord Carroll*, 2012 WL 3780449, at *5 (holding that the officers' reliance was not objectively

reasonable and refusing the apply the good faith exception, noting that "[t]he Fourth Circuit has made clear that a reasonable police officer will not rely on warrants containing no information as to when the criminal activity actually occurred . . . ."). In addition, in *Carroll*, where no information as to time frame was provided in the affidavit in support of probable cause, the court held "that the officer's conduct arguably did rise to the level of gross negligence, and that the deterrent effect the court's ruling will have on police misconduct weighs in favor of exclusion[.]" 2012 WL 5350364, at *7. The *Carroll* court held that the deterrent effect on the affiant officer was sufficient to weigh in favor of suppression: because the conduct at issue was committed by the officer who "wrote the affidavit submitted to the reviewing judicial officer, that officer and presumably the entire city police department will know, from this point forward, that search warrants and accompanying affidavits must include the dates informants actually observed the criminal activity." *Id.* at *6. Similarly here, where no information about the time frame at issue was provided in the affidavit and Detective Heckman, who played a major role in the investigation, authored the affidavit, the officers' reliance on the resulting order was not objectively reasonable and there is a sufficient deterrent effect weighing in favor of suppression. *See id.* at *7.

Finally, as discussed above, the provision allowing the collection of information about the contacting telephones is grossly overbroad and not particularized. Detective Heckman repeatedly testified at the hearing that he and other officers never tried to obtain GPS location information for contacting telephones pursuant to these provisions, because they knew the service providers would not provide that information without an order supported by probable cause as to those specific telephone numbers. *See, e.g.*, Hr'g Tr. Vol. I [DE-194] at 81. While the good faith exception is an objective inquiry, Detective Heckman's testimony as to the

provision about the contacting telephones certainly undercuts any argument that an objectively reasonably officer could rely on the first pen order. Thus, where the first pen order contains such a grossly overbroad provision, the third exception applies and the officers' reliance was objectively unreasonable. Additionally, the fourth exception could apply here as well: because the order is so facially deficient based on the provision as to contacting telephones, officers could not reasonably presume it to be valid. *Bynum*, 293 F.3d at 195. For these reasons, the good faith exception cannot apply to the first pen order.

Having found the issues discussed above to be dispositive, the undersigned does not reach any remaining arguments raised by Defendants or the Government on this topic. However, it is worth noting briefly that Defendants' arguments as to magistrate shopping and evading an explicit prohibition by the federal court against obtaining GPS location data are unfounded on the current record. Additionally, to the extent that the Government argues the orders at issue here are similar to orders upheld by the North Carolina Court of Appeals in *North Carolina v. Perry*, 776 S.E.2d 528 (N.C. Ct. App. 2015) and by this court in *United States v Bey*, No. 5:15-CR-166-BR, the suppression motions in those cases focused largely on the admissibility of historical CSLI, not prospective GPS location data as is the main issue in the instant case.

### d. Severability

There appears to be no case on point applying the severance analysis to orders styled as the functional equivalent of warrants. Assuming *arguendo* that the analysis applies in this situation, even if probable cause supported the first pen order as to the target phone number, the provision authorizing collection of information about the contacting telephones is not severable. Severability can apply to a warrant with invalid portions "only if 'the valid portions of the warrant [are] sufficiently particularized, distinguishable from the invalid portions, and make up

the greater part of the warrant.'" *United States v. Sells*, 463 F.3d 1148, 1151 (10th Cir. 2006) (quoting *United States v. Naugle*, 997 F.3d 819, 822 (10th Cir. 1993)). A reviewing court performs a multi-step analysis to determine whether severability applies:

> the court first separates the warrant into constituent clauses and determines whether each clause is sufficiently particularized and supported by probable cause. [*United States v. Galpin*, 720 F.3d 436, 448-49 (2d Cir. 2013)] (citing *Sells*, 463 F.3d 1148). The court then must determine whether the valid clauses are distinguishable from the invalid clauses, considering whether the removal of the invalid clauses "leaves behind a coherent, constitutionally compliant redacted warrant," and "whether the valid portions make up only an insignificant or tangential part of the warrant." *Id.* at 449. "[S]everance is not available when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search." *United States v. Patrick*, 916 F. Supp. 567, 574 (N.D. W.Va. 1996).

*Powers*, 1 F. Supp. 3d at 478-79; *see also Sells*, 463 F.3d at 1155 ("our first step in determining whether the severability doctrine is applicable is to divide the warrant into individual phrases, clauses, paragraphs, or categories of items.") (citation omitted). In examining whether the portions are divisible, the extent to which the portions are intertwined must be considered. *Sells*, 463 F.3d at 1158 ("Where, as here, each of the categories of items to be seized describes distinct subject matter in language not linked to language of other categories, and each valid category retains its significance when isolated from [the] rest of the warrant, then the valid portions may be severed from the warrant.") (citations omitted). "If the parts may be meaningfully severed, then we next look to the warrant on its face to determine whether the valid portions make up 'the greater part of the warrant,' by examining both the quantitative and qualitative aspects of the valid portions relative to the invalid portion." *Id.* at 1151. "[M]erely counting parts, without any evaluation of the practical effect of those parts, is an improperly 'hypertechnical' interpretation of the search authorized by the warrant." *Id.* at 1160 (citations omitted). Indeed, "[a] warrant's invalid portions, though numerically fewer than the valid portions, may be so broad and invasive

that they contaminate the whole warrant." *Id.* (citations omitted) "Common sense indicates that we must also evaluate the relative scope and invasiveness of the valid and invalid parts of the warrant." *Id.*; *see Powers*, 1 F. Supp. 3d at 479 (although holding that probable cause was lacking, holding in the alternative that severability was not available based on the scope and invasiveness of the invalid portions of a warrant which would have permitted "a vastly more invasive search" than would have been allowed by the arguably valid portion).

Here, Defendants argue that because the paragraph defining the "records and other information" sought in the first pen order includes both the target phone number and the provision about contacting telephones, the order does not contain separate portions that are divisible from one another. Joint Suppl. Br. [DE-203] at 37-41. In response, the Government argues that the order seeks nine categories of information as to both the target telephone and contacting phone numbers. Gov't Suppl. Br. [DE-213] at 22. Because the "records and other information" described in the first pen order link the target telephone and the contacting phone numbers, the undersigned cannot find that "each of the categories of items to be seized describes distinct subject matter in language not linked to language of other categories" such that there are divisible portions of the first pen order. *Sells*, 463 F.3d at 1158. However, even if there were divisible categories of information, the invalid portions allowing the collection of information as to the contacting telephones are so broad in scope and invasiveness that "they contaminate the whole [order]." *Id.* at 1160. The affidavit presents facts attempting to establish probable cause to allow for the collection of information related to the target telephone number, yet the invalid portions purport to allow the collection of information up to and including GPS location information for any number that contacts the target telephone. Like in *Powers*, this would allow for "a vastly more invasive search" than would be permitted by the arguably valid portions. 1 F.

Supp. 3d at 479. Accordingly, even if the order did contain divisible portions, the undersigned cannot find that the valid portions make up the greater part of the warrant such that severability can be applied. Thus, even if probable cause existed to allow for the collection of information as to the target telephone number, severability would not apply to allow the invalid portion as to contacting telephones to be stricken.

### e. *Fruit of the Poisonous Tree*

Generally, absent an exception, the exclusionary rule requires the suppression of evidence discovered and seized in violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144; *see also Hudson*, 547 U.S. at 591. Additionally, "[c]ourts will also suppress evidence that is the indirect product of the illegal police activity as 'fruit of the poisonous tree.'" *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) (citing *Wong Sun*, 371 U.S. at 488). The critical inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality of instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (internal quotation and citation omitted).

Defendants argue that information collected as a result of the first pen order was used in applying for every subsequent order or warrant in this case, and thus all information collected pursuant to those orders and warrants is the fruit of the unconstitutional collection of GPS location data from the first pen order and should be suppressed. Joint Suppl. Br. [DE-203] at 42-49. In support of their argument, Defendants cite to statements from the subsequent applications

45

(which include applications for pen orders to track cell phones, to perform GPS location tracking on vehicles, for search warrants, and for bank records) discussing surveillance conducted with the assistance of cell phone tracking. *Id.* Further, in the Government's original response to the motion to suppress, it stated "the Government acknowledges that at various points in the investigation from December of 2014 until June of 2015, detectives with the Raleigh Police Department did use GPS information to assist in conducting their physical surveillance of the Defendants. Therefore, the only issue before this Court is whether that information was lawfully obtained." Gov't Resp. [DE-157] at 2. The Government argues that there is no deterrent effect served by suppressing evidence in this case where officers were seeking explicit judicial approval for their actions. Gov't Suppl. Br. [DE-213] at 25-28. Additionally, the Government contends that officers were not able to obtain much tracking information from the first pen order because Defendant Sidbury's phone was often turned off during the period at issue, and the location coordinates were very broad and not very precise. The Government states that "such information was not the cornerstone of the entire investigation" and notes that "detectives were also actively engaged in other investigative efforts to follow up on the original tips, conduct physical surveillance, obtain bank records, intercept packages, and identify co-conspirators, among other things." *Id.* at 27-28. The Government argues that the inevitable discovery doctrine or the independent source doctrine should apply where "[t]he same evidence in this case would have been inevitably discovered through the other investigative means which the officers did in fact subsequently employ, most notably their direct physical surveillance to follow the defendant in undercover vehicles to see which banks he frequented and which residences he visited." *Id.* The Government does not present any further facts in support of this argument beyond this conclusory statement, nor was any testimony offered on this point at the hearing.

Based on the arguments presented and evidence cited by the Defendants, the information collected pursuant to subsequent orders and warrants in this case is the fruit of the poisonous tree based on the unconstitutional collection of GPS location data from the first pen order. As discussed above, where no information about the time frame at issue was provided in the affidavit and Detective Heckman, who played a major role in the investigation, authored the affidavit, officers' reliance on the resulting order was not objectively reasonable and there is a sufficient deterrent effect weighing in favor of suppression. *See Carroll*, 2012 WL 5350364, at *7. Further, there is a sufficient deterrent effect weighing in favor of suppression based on the presence of the provision allowing the collection of information related to contacting telephones, where Detective Heckman testified that officers knew they would not be able to seek information based on that provision and thus knew it was facially invalid. The question for resolution thus becomes whether either the independent source doctrine or the inevitable discovery doctrine applies to these facts.

The inevitable discovery doctrine provides that unlawfully seized evidence may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . ." *Nix v. Williams*, 467 U.S. 431, 444 (1984). A related doctrine is the independent source doctrine, which provides that "evidence seized pursuant to a subsequently issued warrant, although initially discovered during [an illegal search], is admissible so long as 'the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue.'" *United States v. Walton*, 56 F.3d 551, 554 (4th Cir. 1995) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). The independent source doctrine cannot apply to these facts, where the Government is seeking to show that the fruit of the unconstitutionally-obtained GPS

47

location data should be admitted, not the unconstitutionally-obtained GPS location data itself. As to the inevitable discovery doctrine, the Government has the burden to show by the preponderance of the evidence that the later-discovered evidence would have been discovered through independent lawful means. *Nix*, 467 U.S. at 444. The Government has fallen far short of its burden in this instance. *Cf. Wilford*, 961 F. Supp. 2d at 767-68 (applying the independent source doctrine after holding that GPS vehicle tracking was unconstitutional: "GPS tracking was not the only basis for surveillance of Wilford. Law enforcement pinged Wilford's cell phone, pursuant to court orders that . . . were lawful. Additionally, law enforcement authorities were simultaneously tracking Wilford's co-conspirators, through GPS and pinging, which Wilford lacks standing to challenge."). In *Wilford*, the Government presented specific dates of surveillance that took place pursuant to these alternate methods aside from the unconstitutional vehicle GPS tracking, such that the court could determine that it had met its burden of showing by a preponderance of the evidence that the evidence would have inevitably been discovered. *Id.* Here, the Government has presented only conclusory statements lacking the specificity present in *Wilford*, and has failed to meet its burden to show that the inevitable discovery doctrine should apply.

Accordingly, it is recommended that Defendant Sidbury's motion to suppress the cell phone tracking [DE-128] be granted, and all evidence obtained as a result of the GPS tracking conducted pursuant to the first pen order be suppressed as to Defendant Sidbury. As this recommendation necessarily affects the motions to suppress the vehicle tracking and the bank records [DE-133, -136, -146], alternative recommendations as to those motions are made *infra* in the event the evidence obtained as a result of those orders and warrants is found not to be fruit of the initial unconstitutional collection of GPS location data.

### f.    *Defendant Sykes' Motion to Join [DE-129]*

Defendant Sykes also moves to suppress the GPS location tracking performed as a result of a pen order signed on June 9, 2015, authorizing the release of information up to and including GPS location information for Defendant Sykes' cell phone. [DE-129]; June 9, 2015 Order [DE-129-1] at 5-7. The June 9, 2015 pen order was the only such order signed in this case for Defendant Sykes' phone. Hr'g. Tr. Vol. I [DE-194] at 136. The June 9, 2015 pen order contains the same provision allowing for the collection of information, up to and including GPS location information for telephones that contact Defendant Sykes' phone number (the target number). June 9, 2015 Order [DE-129-1] at 5-7. Thus, the same reasoning as discussed above in relation to the first pen order applies with equal force to this order authorizing the tracking of Defendant Sykes' phone as a result of the invalid provision: the order is not supported by probable cause based on this grossly overbroad provision, the good faith exception cannot apply where the order is so lacking in probable cause and so facially invalid as to make official reliance on it objectively unreasonable, the invalid portion is so broad in scope and invasiveness that it invalidates the whole order and the portion of the order addressing the target phone number is not severable, and there is a sufficient deterrent effect such that suppression is warranted. Accordingly, it is recommended that Defendant Sykes' motion to adopt [DE-129] is granted and all GPS location information collected as a result of the June 9, 2015 pen order be suppressed as to Defendant Sykes.

### B.    Defendant Sidbury's Motion to Suppress Vehicle Tracking [DE-133]

Defendant Sidbury argues that information obtained through the warrantless GPS tracking of his vehicles should be suppressed because the state court orders that authorized the GPS tracking are not the functional equivalent of warrants for three reasons: (1) the orders fail to

49

establish any temporal proximity between the allegations and the requested tracking; (2) many of the allegations are merely conclusory statements; and (3) the applications fail to establish that tracking the specific vehicles at issue will reveal evidence of a crime or contraband. Def. Sidbury's Mot. [DE-133]. Further, Defendant Sidbury argues that the state court orders fail to comply with both North Carolina and federal statutory law governing warrants and the good faith exception should not apply where, based on *United States v. Jones*, — U.S. —, 132 S. Ct. 945 (2012), it was clear that GPS vehicle tracking required a warrant. *Id.* In response, the Government reasserts its earlier argument that the state court orders are the functional equivalent of warrants and are supported by probable cause, and even if the court finds that they are not, the good faith exception should apply to permit the introduction of the tracking evidence. Gov't Resp. [DE-157].

### *1.    Testimony of Sergeant Pennica*

Sergeant Pennica testified that a GPS tracker was first installed in Defendant Sidbury's vehicle on January 9, 2015. Hr'g Tr. Vol. II [DE-210] at 224-29. He stated that Defendant Sidbury's vehicle was tracked until May 4, 2015, the equivalent of 116 days of tracking, despite the defense's claim of 192 consecutive days of tracking. Further, Sergeant Pennica stated that within that 116-day period, there were times when the vehicle was not moving, so it was not being tracked.    Sergeant Pennica testified that he was aware that officers needed court authorization to install a GPS vehicle tracking device, but stated that the orders used in this case had been reviewed by the Raleigh Police Department's attorney and presented to numerous judges without any difficulties. Sergeant Pennica estimated that his unit had sought 70 or 80 similar orders for vehicle tracking devices in 30 different cases. *Id.*

On cross-examination, Sergeant Pennica admitted that there was a GPS tracking device on Defendant Sidbury's vehicle for longer than the 116-day period previously described. After that period, Defendant Sidbury's vehicle was not moving, but officers were able to locate it utilizing the GPS tracking device. When asked whether he needed a warrant to install a GPS vehicle tracker, Sergeant Pennica responded that he knew court authorization was needed but he did not understand the *Jones* decision to require a warrant. Sergeant Pennica confirmed that officers would need some government or judicial oversight, and would have to show a basis for why the vehicle tracking was needed. Sergeant Pennica stated that generally, officers need a warrant to search the contents of an item (such as a briefcase), but he did not believe that tracking a vehicle equated to searching the contents of an item. Finally, Sergeant Pennica confirmed that officers did not seek warrants in this case, but instead sought court orders. *Id.*

### 2. *Analysis*

The Supreme Court has held that GPS vehicle tracking is a search for Fourth Amendment purposes, *Jones*, 132 S. Ct. at 949, and the Fourth Circuit has held in an unpublished opinion that the warrantless use of a GPS vehicle tracking device is unconstitutional. *United States v. Sellers*, 512 F. App'x 319, 2013 WL 749512, at *6 (4th Cir. Feb. 28, 2013) (unpublished) (per curiam) ("Just as in *Jones*, the DEA agents in this case attached a GPS device to a target's vehicle and used the device to gain information about the target's whereabouts, all absent a valid warrant. The search in this case, therefore, violated James's Fourth Amendment rights.") (footnote omitted). While the GPS tracking in this case would be constitutionally valid if supported by probable cause, *see Dalia*, 441 U.S. at 256, the facts here do not provide a substantial basis for finding probable cause.

The probable cause affidavit presented in the application for the first GPS vehicle tracking for two of Sidbury's vehicles [DE-133-1] at 1-2 ("first vehicle tracking order") states as follows:

> I, Detective K.C. Heckman am conducting a drug investigation on John Boynton Sidbury. Sidbury has been involved in marijuana trafficking in Raleigh for many years. The Raleigh DEA office received a very detailed tip concerning Sidburys [sic] drug activities. This tip included Sidbury's current residence ([redacted] Raleigh), Current vehicle's [sic] owned and operated by Sidbury (including the two above listed vehicles), phone numbers, associates of Sidbury and possible stash locations. All the information provided by the tipster has been verified to be true. Surveillance has been established on Sidbury and his habits are consistent with drug activity. I have followed Sidbury to numerous banks in Raleigh where he is exchanging small bills for $100.00 bills. Sidbury conducted over $13,000.00 in cash transactions during one day. Sidbury has also been linked to funnel accounts in LA, [sic] California where he has deposited over $150,000.00 cash which was likely used to purchase marijuana.
>
> Sidbury has traveled to California during these periods of surveillance. Bank Records have been obtained for his BB&T and Wachovia accounts. The total bank balance exceeds over $85,000.00 in his personal accounts. According to NCESC (Employment Security Commission), Sidbury does not have a job and has not reported income in the past 3 years. I have observed Sidbury operating the Honda Accord on 2 ocassions, [sic] and Detective Gibney has observed Sidbury operating the 2014 GMC Sierra truck.

Wake County Superior Court Judge Collins signed the first vehicle tracking order on January 6, 2015. *Id.* at 3-4.

Here, Detective Heckman's affidavit suffers from many of the same infirmities as discussed above in relation to the GPS cell phone tracking. Once again, there is no basis from which to determine the anonymous tipster's reliability or basis of knowledge, no corroboration of the tipster's information is described, and there is no date as to any of the allegedly criminal activity described in the application. *See Doyle*, 650 F.3d at 474, *Davis*, F. Supp. 2d at 561-62. This is a particularly serious error where Detective Heckman is describing his own surveillance efforts and cash transactions that he observed taking place. Additionally, at the hearing,

Detective Heckman admitted that officers did not verify all of the information provided in the anonymous tip letters. Hr'g Tr. Vol. I [DE-194] at 132. This conflicts with the statement contained in the application that "[a]ll the information provided by the tipster has been verified to be true." [DE-133-1]. However, even if that statement were true, this affidavit would still be insufficient where it does not provide any of the information obtained in the anonymous tip and merely asks the reviewing judicial officer to take the affiant's word that information was provided and the officers have verified that information to be true. *See Gates*, 462 U.S. at 238. Accordingly here, where there is no basis from which to determine the anonymous tipster's reliability or basis of knowledge, no corroboration is described, and no time frame is provided as to the allegedly criminal activity, there is no substantial basis for determining the existence of probable cause. Additionally, where no information about the time frame at issue was provided in the affidavit and where Detective Heckman, who played a major role in the investigation, authored the affidavit, the officers' reliance on the resulting order was not objectively reasonable and there is a sufficient deterrent effect weighing in favor of suppression. *See Carroll*, 2012 WL 5350364, at *7. Thus, the good faith exception is not available in this situation. Therefore, in the event that information collected pursuant to the vehicle tracking orders is not determined to be fruit of the unconstitutionally-collected cell phone GPS location data, it is recommended that alternatively, Defendant Sidbury's motion to suppress the vehicle tracking [DE-133] be granted.[6]

---

[6] It appears that tracking information collected as a result of the first vehicle tracking order was utilized in the application materials for the subsequent vehicle tracking orders. *See* [DE-133-2] at 1-2 (describing locations of the vehicles included in the first vehicle tracking order in the application for the second vehicle tracking order). Accordingly, any information collected pursuant to the subsequent vehicle tracking orders would be the fruit of unconstitutionally-collected GPS tracking location information collected as a result of the first vehicle tracking order and also subject to suppression.

### C. Defendant Sykes' Motion to Suppress Statements [DE-138] and Motion to Suppress Fruits of Electronic Search [DE-139]

Defendant Sykes argues that her statements were obtained in violation of her Fifth Amendment rights when she was subject to custodial interrogation during the execution of the search warrant at her home on June 22, 2015.[7] Def. Sykes' Mot. [DE-138]. Defendant Sykes argues that she was subject to physical and psychological coercive pressures when she was detained in her home for at least four hours with five or six male law enforcement officers present, and argues further that she was not told she was free to leave, not read her *Miranda* rights, not allowed to speak with an attorney when she requested to do so, ordered to sit in a certain place by officers, kept in the sight of officers except when she was allowed to use the restroom, and was called "stupid" during hours of questioning. *Id.* Defendant Sykes also points out that a childhood friend who is a member of the Raleigh Police Department but was not involved in the investigation was present during the encounter and continually told her that he tried to vouch for her. *Id.* In response, the Government argues that *Miranda* warnings were not required where Defendant Sykes was never in custody on June 22, 2015, and Defendant Sykes' statements were voluntary as there is no evidence that her will was overborne where only two officers questioned her, she was not restrained, no weapons were visible, the questioning took place in her living room in daylight hours, and Defendant Sykes had worked as a paralegal in a criminal defense law firm. Gov't Resp. [DE-154]. Further, the Government argues that Defendant Sykes did not clearly and unambiguously invoke her right to counsel. *Id.* In reply, Defendant Sykes argues that the Government cites no authority for the proposition that

---

[7] Defendant Sykes does not specify which specific statements she seeks to suppress.

Defendant Sykes' professional background is an appropriate consideration in determining whether she was in custody. Def. Sykes' Reply [DE-166].

As to the search of Defendant Sykes' electronic devices, she argues that any purported consent was not given knowingly and voluntarily. Def. Sykes' Mot. [DE-139]. Specifically, she points to the fact that she was questioned for over four hours by five or six male officers, was told that the only way to receive her devices back was by consenting to the search, was not told she had the right to consent to less than a full forensic analysis of her devices, and was not allowed to speak with independent legal counsel. *Id.* Defendant Sykes also argues that to the extent the court finds her consent was valid, the search exceeded the scope of her consent, which was limited to the criminal activity referenced in the search warrant.[8] *Id.* In response, the Government argues that the totality of the circumstances demonstrates that Defendant Sykes gave valid consent to search her electronic devices, including that she signed a written consent to search form. Gov't Resp. [DE-154]. The Government contends that even if the court determines that Defendant Sykes did not voluntarily consent to the search, the good faith exception should apply where officers intended to obtain a second search warrant for the contents of Defendant Sykes' devices. *Id.*

### 1. *Factual Summary*

While these motions require distinct and separate legal analyses, they are grounded in the same set of facts. The following factual summary is taken from the testimony of Sergeant Pennica, Detective Heckman, and Defendant Sykes.

---

[8] Defendant Sykes also argues that the search of the contents of the electronic devices was not authorized by the search warrant for her residence. Def. Sykes' Mot. [DE-139]. However, because the Government responds that it does not contend the search of the devices was conducted pursuant to the warrant, Gov't Resp. [DE-154], the undersigned does not reach this argument.

According to Sergeant Pennica and Detective Heckman, officers originally obtained a search warrant on June 9, 2015 for Defendant Sykes' residence, but Defendant Sykes was not home when they tried to execute the warrant so they obtained a second warrant and ultimately executed it on June 22, 2015. They were seeking documents, computer equipment, and other items related to money laundering as the investigation had revealed that Defendant Sykes was laundering money for Defendant Sidbury. On June 22, 2015, officers arrived at 1:30 p.m. but did not see any activity at the home, and waited until 2:20 or 2:30 p.m. when they saw Defendant Sykes leaving her house carrying a wheelchair.[9] Six officers were on scene, sitting in four or five unmarked police cars in the parking lot, watching Defendant Sykes' car and the entrance to her townhome. Sergeant Pennica believed that the officers were obtaining GPS location data on Defendant Sykes' phone while they were performing surveillance, and that data indicated Defendant Sykes was inside her townhome. The officers who were present initially were Sergeant Pennica, Officer Jones, Detectives Heckman and Mitchell, and Sergeant Marshburn. Lieutenant Quick was present for the search of the home, but it does not appear that he was outside when officers first encountered Defendant Sykes. Defendant Sykes left her townhome and was struggling to carry a heavy wheelchair down the winding steps from her front door to her car when Detectives Heckman and Mitchell approached her on foot. The officers were wearing jeans and t-shirts, were not wearing tactical gear aside from Detective Heckman, who wore a bulletproof vest over his shirt, and did not have weapons drawn. Once they reached Defendant Sykes, the officers explained that they were investigating Defendant Sidbury's

---

[9] On cross-examination, Sergeant Pennica indicated that officers arrived at Defendant Sykes' residence at 11:00 a.m. Hr'g Tr. Vol. II [DE-210] at 273-74. Regardless of what time the officers arrived, the testimony of Sergeant Pennica, Detective Heckman, and Defendant Sykes is consistent that the officers did not interact with Defendant Sykes until approximately 2:20 or 2:30 p.m.

organization and they had a search warrant for her home to look for paperwork and computers. After the initial contact with Detectives Heckman and Mitchell, the other officers approached Defendant Sykes as well, and followed her into the residence. Defendant Sykes was not handcuffed, restrained, or arrested, and was carrying a purse that she brought inside with her and laid on the kitchen counter. Hr'g Tr. Vol. II [DE-210] at 241-45, 273-83, 310-14, 342-49.

Defendant Sykes, however, testified that as she was trying to get the wheelchair into her car, two cars approached her from either side. One individual confirmed her identity as she was surrounded by other officers. Defendant Sykes could not remember whether the cars parked behind her vehicle or to the side, but there was enough room to open her car door because Sergeant Pennica helped her load the wheelchair into her car. Defendant Sykes did not believe that she tried to get into her car once the officers arrived. She remembered standing in the parking lot and feeling confused as officers showed her the search warrant. Defendant Sykes asked whether she could call someone, and one officer responded that she could not call anyone at that time, and they had the search warrant and could come into her house. Defendant Sykes did not ask to speak with an attorney at that point, and when asked what she meant by asking to speak with someone, Defendant Sykes responded that she did not know what was going on, had never been in a situation like that before, and felt like she needed to call someone, whether that was an attorney or a parent, to figure out what to do. None of the officers told Defendant Sykes that she could leave in her car, and Defendant Sykes did not know she had the option to leave. Defendant Sykes went inside her home with the officers because she did not feel like she had another choice. Id. at 342-49.

As the officers followed Defendant Sykes into the house, Sergeant Pennica testified that they had a "low key" demeanor with her and were talking about what they had discovered in

57

their investigation. Once they entered the townhome and Defendant Sykes put her purse down, the officers did a quick search of the living room for guns or knives and then asked Defendant Sykes to sit down but did not order her to sit in a particular location. According to Sergeant Pennica, the living room had an angled fireplace in one corner, a couch against one wall, one chair backed up to the kitchen, and another chair backed up against the bottom of the stairwell. Defendant Sykes chose to sit in the chair backing up to the stairwell, Lieutenant Quick sat on the couch, and Sergeant Marshburn sat in the chair backing up to the kitchen. Sergeant Pennica was moving around the home supervising the search, and Officer Jones and Detectives Mitchell and Heckman were carrying out the search. During this time, Defendant Sykes was speaking with Sergeant Marshburn and Lieutenant Quick, and Sergeant Pennica was coming in and out of the living room to show Defendant Sykes what the officers had recovered. As to Sergeant Marshburn, Sergeant Pennica stated that he was not part of their unit, but was included on the search because he knew Defendant Sykes from high school. The officers were seeking Defendant Sykes' assistance and cooperation and believed the presence of Sergeant Marshburn would be calming and demonstrate that the officers were not there adversarially. *Id.* at 245-49, 310-14.

Defendant Sykes described her townhome as having an open layout. From the front entrance, a hallway connects to the back door through the living area, with a washer and dryer and a half bath on the left side by the front entrance. To the right of the front door is the kitchen area, which connects to the living area in the back. Defendant Sykes does not remember who took a seat first, but as her living room is so small, there were not many options of where to sit. As to Sergeant Marshburn, Defendant Sykes testified that she got the impression he was there for support and to make her feel at ease during the search, as he was a familiar face. Defendant

Sykes and Sergeant Marshburn did not speak privately, but Sergeant Marshburn let her know that he had vouched for her to the other officers and told them that she had never been in trouble before. Defendant Sykes was embarrassed and scared, but seeing Sergeant Marshburn did make her feel more comfortable. Defendant Sykes stated that she has known Sergeant Marshburn all of her life, went to school with him while she was growing up, visited him during college, and considered him to be a good friend. Sergeant Marshburn kept telling Defendant Sykes about how much trouble she was in and that she was "fucked." Defendant Sykes testified that neither Sergeant Marshburn nor Lieutenant Quick participated in the search, which she estimated lasted for four hours. Defendant Sykes stated that the officers were speaking with her constantly, asking question after question about what they were finding throughout the house. *Id.* at 349-54.

Sergeant Pennica stated that Defendant Sykes was not detained and that officers "just asked her to step back in the house, and we didn't force her back into the house. We didn't make her go back in. She just walked back in with us, as we—we asked her to. We didn't demand it." *Id.* at 250. Despite this statement, Sergeant Pennica admitted that Officer Jones authored a report that stated Defendant Sykes was detained when she walked outside of her residence. [DE-138-4]. Sergeant Pennica stated, however, that he did not have access to reports authored by Officer Jones and had not previously seen that report or discussed its contents with Officer Jones. Further, when asked whether he was surprised that Officer Jones stated that Detective Heckman read Defendant Sykes her *Miranda* rights, Sergeant Pennica responded that he was surprised by that statement because he did not hear that exchange taking place. The officers started the search around 2:30 p.m. and Sergeant Pennica believed they finished around 5:00 p.m. Sergeant Pennica testified that at one point, after several of the officers had already left, Defendant Sykes was still in the living room with Detective Heckman and was sitting on the

59

floor leaning against the coffee table and resting her head in her hand. When asked about Defendant Sykes' demeanor while officers were speaking with her in the living room, Sergeant Pennica responded that she was upset, nervous, and distraught, and was crying at times. Despite this, Defendant Sykes continued to speak with the officers willingly and never indicated she wanted to stop answering their questions. Sergeant Pennica did not see any officers act aggressively towards Defendant Sykes or yell at her. When asked whether anyone leveled any personal attacks against Defendant Sykes, Sergeant Pennica responded he did not see anyone call her stupid but stated "I remember there were instances where we told her things that were being done didn't seem so smart, that, you know, she needed to kind of wise up and come to her senses and, look, this is the—these are the facts that we know, and you're involved." *Id.* at 249-53, 283-309.

Prior to speaking with Defendant Sykes, Detective Heckman informed her that she was not under arrest. He testified that she was very upset and crying, and he tried to explain to her that she was not under arrest, being placed in handcuffs, or going to jail. Detective Heckman stated that he did not read Defendant Sykes her *Miranda* rights as she was not being subjected to a custodial interview. Detective Heckman testified that he would have read Defendant Sykes her *Miranda* rights if she had been detained or arrested, and he did not even bring a *Miranda* waiver form into the house. Based on his training and experience from making prior arrests, Detective Heckman believed Defendant Sykes was not restrained to the functional equivalent of an arrest. Defendant Sykes was allowed to move about the home and go to the bathroom. Detective Heckman believed he was at the house for two or three hours along with Sergeant Pennica, but stated that the other officers were not there as long. Detective Heckman denied seeing any

officers yelling at Defendant Sykes or threatening her. At no point did Defendant Sykes ask to speak with a lawyer before answering any questions. *Id.* at 314-17.

Defendant Sykes described the questioning as constant, and stated that officers asked her about individuals they claimed were related to Defendant Sidbury, some of whom she did not know. Defendant Sykes responded to the officers' questions, and either confirmed or denied that she knew the people about which they were asking. When asked whether she felt like she was being interrogated, Defendant Sykes responded that she did at times when the atmosphere was very hostile. Defendant Sykes stated that the situation was hostile and she felt intimidated because Lieutenant Quick was continually yelling at her, insulting her, calling her stupid, and asking what she did for a living and how she could hold down a job. Defendant Sykes described being in tears for most of the encounter and feeling scared and hurt. At one point, Defendant Sykes stood up and was reprimanded that she needed to stay seated, so she sat back down. She did not try to stand up again because she was scared and was following the officers' directions. During the search, Defendant Sykes asked to use the restroom and was allowed to do so. *Id.* at 355-60.

Pursuant to the search warrant, officers seized three cell phones, a desktop computer, a laptop computer used by Defendant Sykes for work, and an iPad mini, along with various documents. Detective Heckman stated that the officers' purpose was to seize the electronic devices and then apply for a second search warrant to access their contents. Defendant Sykes was concerned about how long this would take, particularly because she wanted her work laptop back, and Detective Heckman told her that she would possibly receive her electronic devices back faster if she consented to a search. Defendant Sykes indicated she wanted to consent, but asked whether officers thought she should talk to an attorney first. Detective Heckman

responded that it was fine for her to speak to an attorney but she would need one who practiced in federal court, and Defendant Sykes then asked him whether he knew any such attorneys. Detective Heckman responded that he thought he had phone numbers for two attorneys but there was no guarantee that either would be able to help her. Detective Heckman testified that those attorneys were not friends of his, and he believed he had their phone numbers from meeting the attorneys during past cases with which he was involved. Defendant Sykes asked Detective Heckman to contact one of the attorneys. In his report, Detective Heckman stated that he called Tommy Manning first with no answer, and then called Bert Nunley ("Nunley"). However, Detective Heckman testified that he later obtained his phone records and did not see a call to Tommy Manning.

When Detective Heckman contacted Nunley, he explained to Nunley that he was executing a search warrant and Defendant Sykes was concerned about the length of time it would take to apply for a second search warrant for the seized electronic devices, so she was interested in consenting to a search of those devices. Defendant Sykes then took Detective Heckman's phone and spoke with Nunley privately in the kitchen for five or ten minutes, while Detective Heckman waited at the threshold between the kitchen and the living room. Detective Heckman testified that he could hear the sound of Defendant Sykes talking but he was trying not to listen to the conversation itself. Defendant Sykes returned the phone to Detective Heckman, and Nunley spoke with Detective Heckman briefly about the officers' intent to seize the devices at issue and get a second search warrant for their contents. After Defendant Sykes spoke quickly with Nunley again, Nunley informed Detective Heckman that Defendant Sykes would consent to the search. This phone call took place beginning at 6:20 p.m. *Id.* at 253-63, 266-69, 317-21, 331-32.

Defendant Sykes could not remember exactly when officers seized her telephones and other electronic devices, but knew that she did not have access to her phones while officers were searching her house. As the officers were discussing seizing Defendant Sykes' electronics, she was most concerned about her work laptop because she valued her job and did not want her employer to learn what was occurring. After the officers explained that consenting to the search would likely allow Defendant Sykes to get her work computer back faster, Defendant Sykes felt hesitant about signing the form and asked about whether she should call an attorney. Defendant Sykes remembered discussing her previous job as a paralegal for a criminal defense attorney, but was told that she would need to speak with an attorney who practiced in federal court. Detective Heckman contacted Nunley, who Defendant Sykes had never heard of before, Defendant Sykes spoke with him briefly, and Nunley advised Defendant Sykes to sign the consent form. Defendant Sykes did not recall going into the kitchen during the conversation. *Id.* at 361-68.

Sergeant Pennica returned and after hearing what happened, advised Defendant Sykes that officers cannot dispense legal advice or recommend lawyers. He informed Defendant Sykes that she was in no way obligated to use Nunley's services and she was free to use another attorney. To Sergeant Pennica's knowledge, Defendant Sykes did not contact another attorney after he encouraged her to do so. This conversation took place in the foyer of Defendant Sykes' townhome. Sergeant Pennica then advised Detective Heckman that recommending a lawyer was against Raleigh Police Department policy and he should refrain from making such recommendations in the future. Detective Heckman testified that he had not spoken with Nunley about this case prior to execution of the search warrant and did not have any type of arrangement or setup with him.

After this conversation, the officers returned to the police station. Defendant Sykes followed them in her own car and waited for an hour or two in the parking lot while Detective Heckman and Sergeant Pennica were packing up evidence inside the police station. Defendant Sykes was waiting at the police station to try and retrieve her telephones, as they could be downloaded more quickly than the other electronics and there was a unit on duty that evening that could perform the downloads. At the station, Detective Heckman texted Nunley at 7:44 p.m. asking if Defendant Sykes could call him from Detective Heckman's phone as she had a quick question. Gov't Ex. 3. Detective Heckman believed that Defendant Sykes spoke with Nunley, but could not definitively remember the conversation. Afterwards, Defendant Sykes signed the consent to search form at 7:48 p.m. Gov't Ex. 2. On the form, Defendant Sykes indicated her consent to search six electronic devices via forensic analysis: a white iPhone 6, a black Samsung Galaxy phone, a black Samsung flip phone, a white iPad mini, a black Lenovo Thinkpad laptop computer, and a silver Dell Inspiron 5305 desktop computer. The consent form does not indicate that Defendant Sykes' consent to search is limited in any way. Officers were able to complete the download of one phone that evening, and returned it to Defendant Sykes before she left. Defendant Sykes returned the next afternoon with retained counsel, and officers returned the other three items at that point and informed Defendant Sykes that they were having issues downloading the desktop computer and the work laptop, which was password protected. Counsel for Defendant Sykes provided the password and then provided the charger the following day when the laptop's battery died. Defendant Sykes did not limit or revoke her consent to search after obtaining independent counsel. *Id.* at 253-63, 266-69, 263-71.

According to Defendant Sykes, however, she went inside with the officers to a large room filled with cubicles and chairs once she arrived at the police station. This room had a large

area where pictures of individuals were displayed, and Defendant Sykes was seated in a chair at the back of the room. Defendant Sykes stated that "they had me sit in this chair, and I specifically remember them saying that usually people that sit in the chair they handcuff to the chair, but they didn't do that to me, and I don't know if it was a joke or what." *Id.* at 368. Defendant Sykes was still uneasy about signing the consent form and asked if she could speak with Nunley again. Defendant Sykes did not know whether Detective Heckman texted Nunley before calling him, but she was handed Detective Heckman's phone to speak with Nunley while she was sitting in the chair. She testified that Detective Heckman was in the room and could not remember for sure whether Sergeant Pennica was present. After their conversation, Defendant Sykes signed the consent form. She did not call anyone else and did not believe she was told at that point that she could call anyone else. Defendant Sykes confirmed that Sergeant Pennica told her back at the townhouse that she could call another attorney, but stated that she did not have access to a phone to call anyone else and she was not given one of her phones to do so or even a phone book. *Id.* at 367-72.

After Defendant Sykes signed the consent form, Detective Heckman told her to call him later on in the evening, and that she could purchase a phone to do so. Defendant Sykes went to Target and bought a phone, may or may not have gotten something to eat, and returned to the police station to wait in her car. She got her iPhone back that evening, but ultimately the officers told her that they were having trouble downloading some of the devices and they would contact her the following day. Defendant Sykes was not read her *Miranda* rights at any point on June 22, 2015, and stated that she was threatened about being arrested, going to jail, losing her job, and about how disappointed her parents would be. Defendant Sykes was not told that she could leave her townhome and she did not feel free to do so. *Id.* at 372-75. On cross-examination,

65

Defendant Sykes confirmed that she learned prior to entering her home with the police officers that they were there to perform the search, she was not handcuffed inside her home, was not physically restrained to the chair, her movement was not limited other than the fact that officers asked her to stay seated, and she was allowed to use the restroom when she requested to do so. *Id.* at 377-78.

Detective Heckman testified that throughout the entire time on June 22, both at Defendant Sykes' home and at the police station, he did not see anyone yell at, threaten with a weapon, point anything at, handcuff, or instruct Defendant Sykes to stay in a certain place or forbid her from moving. When asked whether anyone called her stupid, Detective Heckman responded that no one would ever point their finger at her and call her stupid, but he believed it may have come up in the context of officers encouraging Defendant Sykes not to "be stupid and go down for somebody else." *Id.* at 327. Defendant Sykes testified that Detective Heckman offered her $10,000 or $15,000 for one of Defendant Sidbury's Camaros and she did not know what to think of this request or whether he was joking, but both Detective Heckman and Sergeant Pennica denied that this took place. *Id.* at 252, 321-28, 334, 360, 338-39.

### 2. *Motion to Suppress Statements [DE-138]*

#### a. *Custody*

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this right, the Supreme Court adopted in *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), several procedural rules governing custodial interrogations, that is, interrogations conducted after a suspect has been formally arrested or "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Prior

66

to any questioning, an individual in custody must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him . . . ." *Miranda*, 384 U.S. at 478-79. Any statement elicited from in violation of these procedural rules is inadmissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (citing *Harris v. New York*, 401 U.S. 222 (1971)).

The parties do not appear to dispute that the officers' conversation with Defendant Sykes at her residence constituted interrogation or that Defendant Sykes was not read her *Miranda* rights. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response . . . .") (footnote omitted). Therefore, the only dispute is whether Defendant Sykes was in custody at any point during questioning on July 22, 2015. If not, then no *Miranda* warning was required. *See United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (holding statements were admissible despite absence of *Miranda* warnings where defendant was not in custody during questioning).

An individual is in custody for *Miranda* purposes when he is formally arrested or his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted). The custody inquiry is objective: the question is not whether the suspect or the interrogating officer believes that the suspect was in custody, but whether a reasonable person in the suspect's position would have understood that he or she was in custody. *Id.* at 442; *accord United States v. Hargrove*, 625 F.3d 170, 181-82 (4th Cir. 2010) (giving limited consideration to the defendant's testimony about his

subjective feelings in considering whether he was in custody) (citing *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) ("Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is always influenced by his self-interest.") (internal quotation marks, citations, and alterations omitted)). Since the determination of whether an individual is in custody is a fact-intensive inquiry, this determination must be made on a case-by-case basis based on the "totality of the circumstances." *United States v. Jones*, 818 F.2d 1119, 1123-24 (4th Cir. 1987) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). A court must first examine all of the circumstances surrounding the interrogation and then determine, under those circumstances, whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d). There are numerous factors to be considered in making a custody determination, including, but not limited to:

> (1) Whether defendant was informed that he was not under arrest and that he was free to terminate the questioning;
>
> (2) Whether defendant possessed unrestrained freedom of movement during questioning;
>
> (3) Whether defendant voluntarily submitted to questioning;
>
> (4) Whether the agents employed strong arm tactics or deceptive stratagems during questioning;
>
> (5) Whether the atmosphere of the questioning was police-dominated;
>
> (6) Whether defendant was placed under arrest at the termination of the questioning.

*United States v. Jefferson*, 562 F. Supp. 2d 707, 713-14 (E.D. Va. 2008) (internal footnotes and citations omitted); *see also United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010) ("Among the

facts to be considered are 'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'") (quoting *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002)).

It is important to note that the environment does not have to be entirely free of coercion in order to be non-custodial—indeed, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. However, in cases where the Fourth Circuit has determined that an individual was subject to custodial interrogation, something more was present beyond the naturally-occurring coercive aspects of being questioned by a police officer. *See United States v. Hashime*, 734 F.3d 278, 282-86 (4th Cir. 2013) (holding that the defendant was subjected to custodial interrogation where he was awoken naked, at gunpoint, after 15-30 officers swarmed his family's home armed with a battering ram in the early morning hours, ordered everyone outside in the cold even though some people were in pajamas, and defendant was questioned in a basement storage room for three hours by two agents); *United States v. Colonna*, 511 F.3d 431, 434-46 (4th Cir. 2007) (holding that an interrogation was custodial and "occurred in a police dominated environment where the agents did everything to make . . . any reasonable man believe that he was not free to leave," where 24 officers swarmed Colonna's home in the early morning hours, awoke him at gunpoint after kicking his bedroom door open, restricted his family's access to their home, kept Colonna under constant guard, and two armed officers interrogated him for three hours in a police vehicle even though he was told he was not

under arrest). Further, in *Hashime*, the officers told the defendant that he had to remain under guard and despite telling him that he did not have to answer their questions, was not under arrest, and he could leave, also told the defendant that they needed to know the truth and he needed to be completely honest even if he was afraid or did not want to answer the questions. 734 F.3d at 282-86.

The location of the questioning is also an important consideration in the totality the circumstances analysis: "an interview at the suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over . . . the defendant, and thus suggests a setting that is not of the degree typically associated with a formal arrest." *Hargrove*, 625 F.3d at 177-82 (collecting cases) (holding a two-hour interview was non-custodial where 10-15 officers arrived in the early morning hours to execute a search warrant, officers had weapons drawn during an initial security sweep, the defendant was subject to a pat-down search, officers told him he was free to leave, the defendant was interviewed by two officers in his kitchen and never asked for the questioning to stop or refused to answer, the defendant was not handcuffed, no weapons were drawn during the interview, and the defendant was permitted to move around his house if it did not interfere with the search); *see also Parker*, 262 F.3d at 417-19 (holding that a 30-minute interview with two agents in a bedroom with the door closed was not custodial where six or seven agents arrived at the defendant's home in the early morning hours, the defendant was neither handcuffed nor restrained, no weapons were drawn in her presence, one of her relatives requested to enter the bedroom during the question and was allowed to do so twice, and the defendant was not forced to go into the room with the officers and was never told that she was not free to leave); *United States v. Mikerin*, No. TDC-14-0529, 2015 WL 2227698, at *4-8 (D. Md. May 7, 2015)

(unpublished) (holding that the defendant was not in custody where he was questioned by two agents in business suits in a conference room at his office from 10:20 a.m. until 2:00 p.m. with a one-hour break, the agents did not display their weapons or physically restrain the defendant, and the agents repeatedly told the defendant he was not under arrest, did not have to answer their questions, and he was free to leave); *United States v. Barmore*, No. 5:14CR41-07, 2015 WL 1585833, at *5-10 (N.D. W. Va. Apr. 9, 2015) (unpublished) (holding that the defendant was not in custody where she was questioned by two officers for 20 minutes with a third nearby at times, 10-20 agents had arrived at the defendant's home at 7:40 a.m. with weapons drawn and initially subjected the defendant to a pat-down search, the defendant was told she was not under arrest and was free to leave, and the defendant was subjected to firm questioning and told she might go to prison or child protective services might have to investigate her).

Here, Defendant Sykes contends that this case is on par with *Colonna* due to the prolonged domination of her home environment by police officers, despite the fact that no weapons or direct threats of physical violence occurred. Def. Sykes' Mot. [DE-138]. In contrast, the Government argues that the facts in this case are distinguishable from *Colonna* and more comparable to those in *Hargrove*, where the court held that the defendant was not in custody. Gov't Resp. [DE-154]. Having considered the relevant factors, this court finds that Defendant Sykes was not subject to custodial interrogation when she was questioned by police officers in her home on June 22, 2015. The following factors weigh against a finding of custodial interrogation: (1) Defendant Sykes was never handcuffed or physically restrained on July 22, 2015; (2) the encounter took place in her home in the middle of the afternoon; (3) the officers did not order Defendant Sykes to come into her residence with them and did not direct her to sit in a certain location within the living room; (4) Defendant Sykes was specifically told

71

she was not under arrest and was not arrested on June 22, 2015; (5) no weapons were displayed, the officers were wearing plain clothes, and there was no physical contact (such as a pat-down search) between the officers and Defendant Sykes; (6) Defendant Sykes spoke with two officers in her living room and occasionally with a third as well; (7) there was no violent entry into her home and she was not forcibly removed from it; (8) as the search was winding down Defendant Sykes was given more freedom to change positions and sit on the floor; (9) Defendant Sykes never asked for the questioning to stop nor did she ask officers to stop questioning her; (10) the officers never told her she was not free to leave; (11) Defendant Sykes was permitted to use the restroom when she needed to do so; and (12) Defendant Sykes herself stated that the questioning was hostile at times, but not throughout the entire encounter. These facts here place the encounter more akin to that in *Hargrove* than *Colonna* and lack the indicia commonly associated with a formal arrest.

To be sure, there are factors that would support a finding of custodial interrogation: (1) the encounter lasted approximately four hours; (2) for at least part of the encounter, six officers were present along with Defendant Sykes in her small townhome; (3) the report of Officer Jones stated that Defendant Sykes was detained outside of her townhome; (4) Defendant Sykes was not allowed to call anyone before the officers began executing the search warrant; (5) Defendant Sykes was not read her *Miranda* rights; (6) Defendant Sykes was told to remain seated when she tried to get up; and (7) Lieutenant Quick called Defendant Sykes stupid, was speaking in a raised voice, and Sergeant Marshburn used language such as "you're fucked."[10] However, given the totality of the circumstances, these facts are not dispositive here.

---

[10] While the officers testified they did not hear anyone yelling at Defendant Sykes or calling her stupid, it is assumed for the purposes of the analysis that this took place.

To the extent that Defendant Sykes wished to call a lawyer before the officers entered her

home, that request was not communicated to the officers where she asked if she could call

someone while she was outside with the officers. An individual's Sixth Amendment right to

counsel only attaches when he or she is subject to custodial interrogation or has been formally

charged. *Davis v. United States*, 512 U.S. 452, 456-57 (1994) (citing *United States v. Gouveia*,

467 U.S. 180, 188 (1984) & *Miranda*, 384 U.S. at 469-73). Ambiguous or equivocal statements

do not constitute invocation of one's right to counsel. *Id.* at 459 ("[I]f a suspect makes a

reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the

circumstances would have understood only that the suspect *might* be invoking the right to

counsel, our precedents do not require the cessation of questioning.") (citation omitted). Indeed,

in *Mikerin*, the defendant made several vague references to obtaining legal counsel while being

questioned, and the court held that he had not clearly invoked his Sixth Amendment right and "to

the extent that such statements could factor into the analysis of whether [he] was in custody in

the first place, they do not establish a custodial interrogation." *Mikerin*, 2015 WL 2227698, at

\*8 (footnote omitted). As to the yelling and cursing, while they are factors to be considered,

they are not dispositive and there is no indication that any threats were made. *See United States

v. Ocasio*, No. 95 Cr. 942 (DAB), 1996 WL 727442, at \*3-4 (S.D.N.Y. Dec. 17, 1996)

(unpublished) (holding that the defendant was not subject to custodial interrogation even though

officers yelled at him, cursed, and told him he was lying, noting that the defendant yelled back

and no threats were made). While Defendant Sykes did not yell back at Lieutenant Quick, no

threats were made here. The officers encouraged Defendant Sykes to cooperate and made

statements to the effect that her parents would be disappointed and she might lose her job, which

do not constitute threats and are permissible under the circumstances. *See id.* at \*4 ("The Agents

were free to discuss with the Defendant the situation that he faced and the advantages of assisting the Government.") (citations omitted). There is no indication that the officers made any statements like those in *Hashime*, that Defendant Sykes had to answer their questions even if she did not want to and that they needed to know the truth. 734 F.3d at 282-86.

While Defendant Sykes focuses on the fact that she was a female alone with a number of male officers, the presence of Sergeant Marshburn with whom she had a personal relationship, the language used, and the length of the encounter, the determination of whether she was in custody is a totality of the circumstances analysis and no one factor is dispositive. Further, the case law does not require that the encounter be entirely free of coercion. *Mathiason*, 429 U.S. at 495. The totality of the circumstances here fails to support a finding that "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. Additionally, this case is vastly different from those where extraordinary numbers of armed law enforcement officers swarmed residences, pointed weapons at suspects and evicted them from their homes, and subjected defendants to interrogation in closed spaces, resulting in findings of custodial interrogation. *See Hashime*, 734 F.3d at 282-86; *Colonna*, 511 F.3d at 434-46. Accordingly, based on the totality of the circumstances, Defendant Sykes was not in custody during the execution of the search warrant at her home on June 22, 2015.

### b. *Voluntariness*

Involuntary statements are inadmissible under the Fifth Amendment. *See Braxton*, 112 F.3d at 780 (citations omitted). "A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *Id.* (citing *Elstad*, 470 U.S. at 304 (further citations omitted)). To determine whether a statement is voluntary, the court considers whether it was "extracted by any sort of threats or violence, [or] obtained by any direct

or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (internal quotation marks and citations omitted). Voluntariness is determined from the "'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980)). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780. The critical inquiry is "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Pelton*, 835 F.2d at 1071-72 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see also Braxton*, 112 F.3d at 783 ("The proper inquiry is whether the confession was 'extracted' *by* the threats or implied promises, 'however slight.'") (quoting *Hutto*, 429 U.S. at 30). In discussing coercive conduct that rendered statements involuntary, the Fourth Circuit has noted the following examples: (1) physically harming or threatening to harm the defendant if he or she refused to answer questions; (2) depriving the defendant of clothes, food, sleep, or contact with others; (3) lengthy periods of questioning or isolation; and (4) deceptive conduct. *See Braxton*, 112 F.3d at 784-85 (collecting cases).

"Truthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." *Pelton*, 835 F.2d at 1073 (holding that the defendant's statements were voluntary where FBI officers stated they would conduct a full scale investigation if he did not cooperate where that was a course that the investigation could legally and properly take); *accord United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005) (holding that statements were voluntary where "the agents simply informed [the defendant] of

75

the gravity of his suspected offenses and the benefits of cooperation under the federal system.");

*Mikerin*, 2015 WL 2227698, at *9 (holding the agents' statements that if the defendant cooperated, his family and Russian business associates would not find out about the investigation, but the investigation would be made public if he did not cooperate did not constitute threats or promises that would render the defendant's statements involuntary). Further, "[a]gents may properly initiate discussions, and may indicate that they will make this cooperation known . . . . General encouragement to cooperate is far different from specific promises of leniency." *Pelton*, 835 F.2d at 1073 (citing *United States v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985)); *see also Braxton*, 112 F.3d at 781-82 (holding that the officers' statements that they needed to talk to the defendant, he could face up to five years in prison, and that they thought he was not coming clean did not constitute coercive conduct). The language used during an interview also factors into the determination of whether any threats or promises were made. *See Arrue v. Hedgpeth*, No. CV 09-06440 ODW (RZ), 2010 WL 4916579, at *2-3 (C.D. Cal. Oct. 8, 2010) (unpublished) (holding that the defendant's confession was voluntary on habeas corpus review pursuant to 28 U.S.C. § 2254(d) where officers told the defendant he was "fucked" because he was facing the possibility of life imprisonment, noting that officers used this language "only in describing the facts in colorful language, and that police made no threats or promises which might have overborne [the defendant's] will."), *adopted by* 2010 WL 4954180 (Nov. 22, 2010).

Here, considering the relevant factors and the totality of the circumstances, Defendant Sykes' will was not overborne or her capacity for self-determination critically impaired so as to render her statements involuntary. Defendant Sykes was not read her *Miranda* rights, but she was an educated, intelligent adult who was interviewed by two officers (three at the most) in her

own living room during the daylight hours in a non-custodial environment, officers had no physical contact with her nor did they threaten her with physical harm, and she was not deprived of any necessity such as food, sleep, clothes, or the ability to use the restroom. Further, while the encounter with the officers lasted approximately four hours, this does not approach lengths of interrogation that have been found to have coerced involuntary statements. *See Davis v. North Carolina*, 384 U.S. 737, 752 (1966) (statement involuntary where suspect was detained for 16 days and interrogated repeatedly); *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944) (statement involuntary where suspect was interrogated for 36 hours without rest or sleep). While officers told Defendant Sykes "you're fucked" and described several possible consequences of conviction, such as the loss of her job and her family being disappointed, as well as the possibility of cooperation, none of these statements constituted impermissible threats or promises which might have overborne Defendant Sykes' will. Additionally, the use of the phrase "you're fucked" is similar to *Arrue*, where the court held that officers were merely describing the situation with colorful language. 2010 WL 4916579, at *2-3.

> In *Braxton*, the court noted that
>
> [b]ecause the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising that "very few incriminating statements, custodial or otherwise, are held to be involuntary." *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990) . . . . This is not a case where law enforcement officers "went to extraordinary lengths to extract from [the defendant] a confession by psychological means." *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam).

112 F.3d at 786. Similarly here, the record does not support a finding that the officers went to extraordinary lengths to extract Defendant Sykes' statements, they were not elicited by coercive conduct on the part of the officers, and Defendant Sykes' will was not overborne nor her capacity for self-determination critically impaired. Accordingly, as Defendant Sykes was not in

77

custody during the search of her home on June 22, 2015, and her statements were voluntary under the Fifth Amendment, it is recommended that her motion to suppress her statements [DE-138] be denied.

### 3.    *Motion to Suppress Fruits of Electronic Search [DE-139]*

Under the Fourth Amendment, a search conducted without a warrant issued upon a showing of probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). A search conducted pursuant to valid consent is one such exception to the Fourth Amendment's general warrant requirement. *Schneckloth*, 412 U.S. at 222 (citations omitted); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001) (citation omitted). In order to be valid, consent to search must be knowing and voluntary, and the determination of whether consent was voluntary is based on the totality of the circumstances. *United States v. Buckner*, 473 F.3d 551, 554-55 (4th Cir. 2007) (citations omitted); *United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001) (citations omitted). The Government has the burden of establishing valid consent to search, which it must show by a preponderance of the evidence. *Buckner*, 473 F.3d at 554 (citation omitted).

> Factors that are appropriate for the district court to consider include the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). Whether the accused knew he possessed a right to refuse consent is a relevant factor, but the government need not demonstrate that the defendant knew of his right to refuse consent to prove that consent was voluntary. Written consent supports a finding that the consent was voluntary. Consent given while in custody may still be voluntary.

*Boone*, 245 F.3d at 361-62 (internal citations omitted). However, the burden of proving voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of

lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that consent was involuntary where police officers falsely represented to a homeowner that they had a search warrant for the home and then asked for consent to search) (footnote omitted).

Voluntary consent cannot be "coerced by threats or force, or granted only in submission to a claim of lawful authority[.]" *Schneckloth*, 412 U.S. at 233 (citations omitted); *see United States v. Elie*, 111 F.3d 1135, 1145-46 (4th Cir. 1997) (holding consent was voluntary even though at least six officers were present when the defendant granted consent to search and noting that the absence of *Miranda* warnings is another factor to be considered in assessing voluntariness and "neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself.") (internal quotation marks, alterations, and citations omitted), *abrogated in part on other grounds by Dickerson v. United States*, 530 U.S. 428 (2000); *United States v. Watson*, No. 5:14-CR-95-BO, 2014 WL 5100610, at \*1-2 (E.D.N.C. Oct. 10, 2014) (unpublished) (determining that consent to search a home was not voluntary where police had already performed a "protective sweep" of the residence, the defendant was handcuffed, had not been read his *Miranda* rights, and was told that the police had "probable cause to get a warrant to search, or you can just consent to the search now"); *United States v. Alvarez-Herrera*, No. 5:13-CR-61-FL, 2013 WL 6531175, at \*23 (E.D.N.C. Dec. 12, 2013) (unpublished) (holding consent was voluntary where the defendant was asked for and gave consent in his native language in the presence of only two officers, the officers made no false or misleading statements suggesting that the defendant could not refuse consent, and the defendant had been cooperative in complying with the officer's requests throughout the encounter); *United States v. Hernandez Sanchez*, No. 5:11-CR-65-FL, 2011 WL 3420605, at \*9 (E.D.N.C. July 8, 2011) (unpublished) (holding consent was voluntary where "there [were] no known

79

characteristics of the defendant, such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary" and officers did not use threatening language or raised voices, despite the fact that the defendant "was subject to a pat-down search, there were up to seven officers present[,] the encounter took more than a few minutes and . . . officers had blocked in [the defendant's] vehicle with at least three of their own vehicles."), *adopted by* 2011 WL 3420598 (E.D.N.C. Aug. 4, 2011).

Defendant Sykes contends that her consent to search was not voluntary primarily based on the length of the encounter (slightly more than five hours at the time she signed the consent form), her lack of access to independent legal counsel, the intimidating atmosphere of being a woman alone with six male officers for an extended period of time, and the fact that she did not know she could refuse to allow the search or could limit her consent. Def. Sykes' Mot. [DE-139]. However, considering the totality of the circumstances and the relevant factors, Defendant Sykes' consent to search her electronic devices was voluntarily given.

Defendant Sykes first spoke to officers about giving consent in her home, and then ultimately signed the consent to search form in an open area of the police station, where she was not handcuffed or physically restrained. The fact that Defendant Sykes signed a written consent form further supports that her consent was voluntary. *See Boone*, 245 F.3d at 361-62. Additionally, in the instant case, like in *Hernandez Sanchez*, "there are no known characteristics of the defendant, such as age, maturity, education, intelligence, and experience, that suggest consent was involuntary." 2011 WL 3420605, at *9. Defendant Sykes is a mature, educated, intelligent adult woman, who has at least some experience with the criminal justice system due to her former employment as a paralegal for a criminal defense attorney. The officers here did not make false or misleading statements suggesting that she could not refuse consent. *See*

80

*Alvarez-Herrera*, 2013 WL 6531175, at \*23. Indeed, they were forthright with her that consenting to a search of her electronic devices might allow her to receive those devices back more quickly, but were clear that they could not make any guarantees. While the following factors would weigh against a finding of voluntary consent, Defendant Sykes was not read her *Miranda* rights, there were raised voices and cursing during the encounter, a little over five hours had passed since Defendant Sykes' interaction with the police began, and at least for part of the encounter, six officers were present with Defendant Sykes alone in her home, they are not dispositive. It is also important to note that Defendant Sykes was not in custody on June 22, 2015, she had been told she was not under arrest, and she was speaking with only one or two officers at the time she decided to give consent. As to her argument that she was not informed she could refuse consent, while this a factor to be considered, it is not necessary that officers inform a defendant of his or her right to refuse consent in order to find that consent was voluntarily given. *See Boone*, 245 F.3d at 361-62.

Finally, the issue of Defendant Sykes' access to independent legal counsel is difficult to resolve on these facts. While it does not appear that Detective Heckman conspired with the defense attorney in order to influence Defendant Sykes into consenting to the search, it is troubling that he facilitated communication between Defendant Sykes and a defense attorney in contravention of the Raleigh Police Department's policy. Further, after being warned by Sergeant Pennica about that behavior, Detective Heckman again helped Defendant Sykes contact the same defense attorney later in the evening. However, Defendant Sykes expressed a desire to speak to an attorney (although that request was ambiguous) before deciding whether to consent, and the officers allowed her to do so. Based on these facts, to the extent that Defendant Sykes' access to the advice of counsel is a proper consideration in whether her consent to search was

voluntary, her conversations with Nunley could weigh both for and against a finding of voluntary consent. However, as discussed above, Defendant Sykes' right to counsel had not attached where she was not subject to custodial interrogation or formally charged, and ambiguous or equivocal statements cannot constitute invocation of one's right to counsel. *Davis*, 512 U.S. at 456-57, 459. Where Defendant Sykes stated "do you think I should get an attorney," Hr'g Tr. Vol. II [DE-210] at 318, this does not clearly invoke her right to counsel. Additionally, it is illustrative to examine the interplay between invoking one's right to counsel and the granting of voluntary consent to search. Even when a suspect is subject to custodial interrogation and has invoked his or her right to counsel, officers may permissibly ask for the suspect's consent to search as such a request does not constitute interrogation for *Miranda* purposes. *United States v. Gonzales*, 151 F.3d 1030, 1998 WL 377901, at *1 (4th Cir. July 1, 1998) (per curiam) (unpublished) (citing *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996) (citing *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993) (collecting cases in agreement from the 5th, 8th, and 9th Circuits))). *But see United States v. Hutchins*, 72 M.J. 294, 29699 (C.A.A.F. 2013) (holding that a request for consent to search was impermissible where the suspect was in custody and had previously invoked his right to counsel). Thus, the impact of Defendant Sykes asking whether she should speak with an attorney prior to deciding whether to consent to a search is lessened here, where she was not in custody and her right to counsel had not attached. Moreover, after Defendant Sykes had retained independent counsel, she did not revoke or limit her consent to search and facilitated the officers performing the search by providing a charger and the password to one of her devices.

Having considered the totality of the circumstances and the relevant factors, Defendant Sykes gave voluntary consent to search her electronic devices. It is thus recommended that her

motion to suppress the results of the electronic search [DE-139] be denied. Finally, while Defendant Sykes argues that her consent to search necessarily involved the criminal activity referenced in the search warrant and officers exceeded the scope of that consent by performing a full electronic download of her devices, Def. Sykes' Mot. [DE-139] at 14-15, this argument is without merit where the consent to search form clearly states that Defendant Sykes is consenting to the search of her electronic devices via forensic analysis. Gov't Ex. 2. Additionally, as this motion to suppress is resolved on the issue of consent, the undersigned does not reach the Government's argument that the good faith exception would apply to these facts.

### D.    Defendant Sidbury's Motion to Suppress Statements [DE-140]

Defendant Sidbury argues that the Government cannot meet its burden of showing that his statements to officers during a hospital interview were voluntary for Fifth Amendment purposes. Def. Sidbury's Mot. [DE-140]. In support of his argument, Defendant Sidbury contends that his weakened physical and mental condition rendered his statements involuntary, specifically noting his unbearable pain and the influence of pain medications, and relies on *Mincey v. Arizona*, 437 U.S. 385 (1978). Def. Sidbury's Mot. [DE-140]. In response, the Government argues that Defendant Sidbury's statements were voluntarily made, pointing to the level of detailed information about his attackers that he was able to provide officers, and the fact that Defendant Sidbury did not lose consciousness during the interview, complain of pain, or ask for the questioning to stop. Gov't Resp. [DE-151]. The Government distinguishes this case from *Mincey*, and instead argues that *United States v. Cristobal*, 293 F.3d 134 (4th Cir. 2002), controls. Gov't Resp. [DE-151].

83

### 1.    *Factual Summary*

The following factual summary is taken from the hearing testimony of Detective Nordstrom and Defendant Sidbury. Detective Nordstrom is a fifteen-year veteran of the Raleigh Police Department who works in the aggravated assault section investigating shootings, stabbings, sexual assaults, and similar crimes. On May 7, 2015, Detective Nordstrom interviewed Defendant Sidbury along with Detective Torrance, another member of the aggravated assault section, at WakeMed hospital because Defendant Sidbury had been the victim of a recent kidnapping. When Detective Nordstrom arrived at the hospital, Defendant Sidbury was in a room with his girlfriend, Ms. Makoni, and another friend, Ms. Hines. Detective Nordstrom testified that Defendant Sidbury had been tortured and, as a result, had extensive injuries. Defendant Sidbury was asleep when Detective Nordstrom arrived, but Ms. Makoni gave permission to wake him. After Defendant Sidbury woke up, due to his injuries he could not open his eyes and he had difficulty speaking, but was not in the intensive care unit and did not have breathing or feeding tubes in his mouth. Detective Nordstrom interviewed Defendant Sidbury solely as it related to him being a kidnapping victim and did not read Defendant Sidbury his *Miranda* rights. According to Detective Nordstrom, Defendant Sidbury appeared to give logical, detailed responses to his questions. Detective Nordstrom's recollection of his questioning was that Defendant Sidbury did not lose consciousness, nor did he indicate he was in pain or ask for the questioning to stop. Defendant Sidbury was able to provide a timeline of the kidnapping, specifically that he was attacked by two males when he returned from a trip to Las Vegas, was tied up, secured with duct tape, handcuffed, and had a bag placed over his head, was transported in his own BMW and then in his Honda, and eventually taken to a storage unit. Defendant Sidbury described his attackers as black males, provided their height and weight, and

gave a detailed description of the masks they were wearing. At no point did Detective Nordstrom ask Defendant Sidbury any questions about drug trafficking or money laundering offenses, and Defendant Sidbury was not handcuffed or restrained in any way and was not under arrest or in custody. At times during the interview, Detective Nordstrom repeated Defendant Sidbury's answers to make sure he was understanding them correctly, with some assistance from Ms. Makoni. Detective Nordstrom did not remember Defendant Sidbury ever telling him that his understanding of Defendant Sidbury's statements was inaccurate. Defendant Sidbury testified that he does not remember the interview in the hospital, and he first learned he had been interviewed after he had been released from the hospital. Hr'g Tr. Vol. III [DE-212] at 424-34.

### 2. *Analysis*

As discussed above, *see supra* Section II.C.2.b, involuntary statements are inadmissable under the Fifth Amendment. *Braxton*, 112 F.3d at 780 (citations omitted). The critical inquiry is "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Pelton*, 835 F.2d at 1071-72 (quoting *Schneckloth*, 412 U.S. at 225). As an initial matter, counsel for the Government argued at the hearing that none of Defendant Sidbury's statements in the hospital related to the instant case, and were taken solely in regards to his status as a kidnapping victim. Thus, it appears that the Government may not intend to introduce those statements in this case, but that representation has not been explicitly made nor has Defendant Sidbury withdrawn his motion based on what was stated at the hearing. As a result, the voluntariness of Defendant Sidbury's statements uttered while in the hospital remains for resolution.

Two different cases, *Mincey* and *Cristobal*, are illustrative in the analysis of this set of facts, where a wounded individual is speaking with law enforcement officers while hospitalized.

In *Mincey*, the defendant was in the intensive care unit after a shooting, was heavily medicated, and had tubes in his mouth and nose such that he could not speak. 437 U.S. at 396-401. An officer interviewed Mincey for four hours until midnight after reading him his *Miranda* rights, even though Mincey clearly stated he did not want to answer questions and wanted a lawyer, Mincey could only communicate in writing, he made several inconsistent statements, repeatedly complained that he was confused, the pain was unbearable, he could not think clearly, and he would be able to better answer the officer's questions the following day. *Id.* Mincey also lost consciousness at points during the interview and was intermittently receiving medical treatment. *Id.* The court held that Mincey's statements were involuntary, noting "[i]t is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than Mincey's." *Id.* at 398. In contrast, in *Cristobal*, the Fourth Circuit held that the defendant's statements were voluntary even though he was interviewed in the hospital for approximately an hour by two officers after he had been shot multiple times and was in soft restraints in his hospital bed. 293 F.3d at 139-41. Cristobal was read his *Miranda* rights, which he waived, communicated in English, did not exhibit slurred speech, did not lose consciousness, did not appear to be in a narcotic stupor, gave a detailed confession, and did not ask for the questioning to stop. *Id.* at 138. The court specifically discussed the fact that Cristobal was under the influence of painkillers and narcotics, noting that "a deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary." *Id.* at 141 (citing *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986)). The court considered whether the officers used coercive tactics, and found that they did not.

> The evidence here does not show that law enforcement officials exploited Cristobal's weakened condition with coercive tactics. Cristobal never requested not to be interviewed due to pain. No officer harmed or threatened to harm Cristobal if he did not waive his rights and answer [the officer's] questions.

*Id.* (internal citations omitted).

Here, considering the relevant factors and the totality of the circumstances, Defendant Sidbury's will was not overborne or his capacity for self-determination critically impaired so as to render his statements involuntary. Defendant Sidbury was interviewed for approximately 15 minutes by two officers while he was with his girlfriend and another female companion in his hospital room.[11] The officers did not read Defendant Sidbury his *Miranda* rights, and with the exception of a couple of inquiries about his employment, only asked questions about the kidnapping. While Defendant Sidbury was gravely injured, he was able to converse with the officers and his difficulty speaking appears to be due to his injuries, not an incapacitated mental state. This conclusion is bolstered by the audio recording of the interview. Gov't Ex. 4. Presumably, Defendant Sidbury was under the influence of medication, but there is no information in the record as to what type of medication he had been administered or the effects of that medication. Defendant Sidbury gave detailed answers to the officers' questions, and was able to provide information about the masks his attackers were wearing, their race, height, and weight, information about the timing of the attack, conversations between the attackers, threats made to Defendant Sidbury's sister, and how they tortured Defendant Sidbury. At times, Defendant Sidbury responded to the officers' questions that he did not remember, but on the whole, he did not appear confused by their questions, never complained of pain, did not ask for

---

[11] The audio recording of the interview is 19 minutes and 12 seconds long, but officers appear to be speaking with the two females for approximately four minutes at the end of the interview. Gov't Ex. 4.

the questioning to stop, and did not state that he did not want to answer the officers' questions. Similar to *Cristobal*, there is no evidence that "law enforcement officials exploited [his] weakened condition with coercive tactics." 293 F.3d at 141 (citation omitted). While it is troubling that Defendant Sidbury stated he does not remember the interview taking place, considering the totality of the circumstances and the relevant factors, relying in particular on the audio recording of the interview, Defendant Sidbury's statements were voluntary for Fifth Amendment purposes. It is thus recommended that Defendant Sidbury's motion to suppress his statements [DE-140] be denied.

### E. Defendant Sidbury's Motion to Suppress Bank Records [DE-136] and Defendant Sykes' Motion to Join [DE-146]

Defendants argue that all bank records obtained in this case were collected as part of a warrantless search that violated both the Fourth Amendment and the North Carolina Financial Privacy Act, N.C. Gen. Stat. § 53B-1 *et seq.* ("NC Financial Privacy Act"). Def. Sidbury's Mot. [DE-136]; Def. Sykes' Mot. [DE-146]. Defendants further contend that the Financial Privacy Act was passed after the Supreme Court's decisions establishing the third party doctrine in *United States v. Miller*, 425 U.S. 435 (1976) and *Smith v. Maryland*, 442 U.S. 735 (1979), and was intended to re-establish a reasonable expectation of privacy in financial records. Def. Sidbury's Mot. [DE-136]. In response, the Government argues that *Miller* and *Smith* are binding precedent that foreclose Defendants' argument as Defendants do not have a reasonable expectation of privacy in their financial records held by the bank, and the Financial Privacy Act only contemplates civil damages as a penalty for violations and does not contain a provision allowing for suppression of evidence. Gov't Resp. [DE-156]. Further, the Government argues

that any objections to the validity of subpoenas or orders used to obtain Defendants's bank records must be made by the bank and not Defendants. *Id.*

The Fourth Circuit in *Graham* recently reaffirmed the long-standing third party doctrine originally announced in *Smith* and *Miller*:

> [u]nder the third-party doctrine, an individual can claim no legitimate expectation of privacy in information that he has voluntarily turned over to a third party. The Supreme Court has reasoned that, by revealing his affairs to another, an individual takes the risk . . . that the information will be conveyed by that person to the Government. The Fourth Amendment does not protect information voluntarily disclosed to a third party because even a subjective expectation of privacy in such information is not one that society is prepared to recognize as reasonable. The government therefore does not engage in a Fourth Amendment search when it acquires such information from a third party.

*Graham*, 2016 WL 3068018, at *3 (internal quotations marks, citations, footnote, and alterations omitted). In *Miller*, the Supreme Court considered whether a defendant could challenge bank records collected pursuant to a defective subpoena, and held that the defendant did not have a legitimate expectation of privacy in bank records, stating that "[s]ince no Fourth Amendment interests of the depositor are implicated here, this case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time [] the subpoena is issued." 425 U.S. at 443-44 (citations omitted). "In order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a 'legitimate expectation of privacy' in the invaded place." *Bullard*, 645 F.3d at 242 (quoting *Bynum*, 604 F.3d at 164). As Defendants do not have a legitimate expectation of privacy in their bank records pursuant to *Miller*, they lack standing to challenge the collection of those records pursuant to the Fourth Amendment.

To the extent that Defendants also argue that the NC Financial Privacy Act re-established a reasonable expectation of privacy in individuals' financial records, this argument is without merit where the penalty for violation of the act is monetary and the act does not discuss the suppression of evidence in a criminal case. *See* N.C. Gen. Stat. § 53B-10 (listing the penalty for violation of the NC Financial Privacy Act as the sum of $1,000, the individual's actual damages sustained due to the disclosure of his or her financial information, and punitive damages as allowed by court if the violation was willful or intentional); *State v. Melvin*, 357 S.E.2d 379, 382 (N.C. Ct. App. 1987) (discussing a federal financial privacy act and noting that it "only authorizes civil penalties or injunctive relief as remedies; by implication, Congress did not deem suppression of evidence to be an appropriate remedy.") (citing *United States v. Kington*, 801 F.2d 733, 737 (5th Cir. 1986)). Accordingly, in the event that Defendants' bank records are not determined to be fruit of the unconstitutionally-collected cell phone GPS location data, it is recommended in the alternative that Defendants' motions to suppress bank records [DE-136, -146] be denied.

### F. Defendant Sidbury's Motion to Dismiss Count One [DE-143]

Defendant Sidbury moves to dismiss Count One of the Second Superseding Indictment for failure to plead all essential elements of the charge, or in the alternative, for a bill of particulars listing the individuals with whom the Grand Jury found Defendant Sidbury conspired. Def. Sidbury's Mot. [DE-143]. Specifically, Defendant Sidbury notes that in contrast to Count Three, which states that Defendants "agree[d] with each other and with other persons," Count One states solely that Defendants "agree[d] with other persons." *Id.* Defendant Sidbury argues that this language excludes the possibility that the Grand Jury found that Defendants conspired with each other, and because Count One does not allege any person with whom Defendant

Sidbury conspired, it is constitutionally deficient. *Id.* In response, the Government argues that Defendant Sidbury's reading of the plain language in Count One ignores the common sense understanding of the words at issue and would lead to an absurd result, Defendant Sidbury has received actual notice of what the Government intends to prove such that he can adequately prepare for trial, and even if the court were to read the language of Count One as Defendant Sidbury contends, it would still be constitutionally sufficient and not subject to dismissal. Gov't Resp. [DE-155].

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged]" incorporating the requirements of the Fifth and Sixth Amendments that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury" and that the accused has the right "to be informed of the nature and cause of the accusation[.]" U.S. Const. amends. V, VI. "An indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962); *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988) (en banc)). When dealing with a conspiracy, "[t]he existence of the conspiracy, rather than the particular identity of the conspirators, is the essential element of the crime." *United States v. Am. Waste Fibers Co.*, 809 F.2d 1044, 1046 (4th Cir. 1987) (per curiam) (citing *United States v. Davis*, 679 F.2d 845, 851 (11th Cir. 1982)).

Federal Rule of Criminal Procedure 7(f) allows a criminal defendant to move for a bill of particulars, a means by which a defendant can acquire information regarding the charges brought

against him "in a vague or broadly-worded indictment." *United States v. Dunnigan*, 944 F.2d 178, 181 (4th Cir. 1991) (citations omitted) (holding indictment was sufficient where it described place and "time frame of the activity," the statutes violated, and "tracked the statutory language defining the offense"), *rev'd on other grounds*, 507 U.S. 87 (1993). The purpose of a bill of particulars is to apprise the defendant of the charges against him with sufficient precision so that he can prepare a defense, avoid unfair surprise at trial, and plead double jeopardy in case of future prosecution for the same offense. *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973) (citations omitted). However, the defendant does not have an unconditional right to a bill of particulars. *United States v. Dulin*, 410 F.2d 363, 364 (4th Cir. 1969) (per curiam) (footnote and citation omitted). A motion for a bill of particulars is not to be used as a discovery device or as a way to obtain "detailed disclosure of the government's evidence" prior to trial. *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985) (citations omitted); *see also United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) (citations omitted).

Rather, a bill of particulars "merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (citations omitted). "A defendant is only entitled to know those central facts which will enable him to conduct his own investigation of the transactions that resulted in the charges against him." *United States v. Stroop*, 121 F.R.D. 269, 272 (E.D.N.C. 1988) (citing *United States v. Manetti*, 323 F. Supp. 683, 695-96 (D. Del. 1971)). Stated differently, "a defendant is 'not entitled to compel the government to describe in detail the manner in which the crime was committed, thereby forcing the prosecution to fix irrevocably the parameters of its case in advance of trial.'" *Id.* (quoting *Manetti*, 323 F. Supp. at 696 & citing

*United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987)). When the government maintains an "open file" policy or when the defendant has "obtained all necessary information from the government's files," the defendant is not prejudiced by a denial of a bill of particulars. *United States v. Amend*, 791 F.2d 1120, 1125-26 (4th Cir. 1986). Likewise, where the indictment alleges every element of the offense charged and alleges facts sufficient to put the defendant on notice of the charges against him, the court need not grant a bill of particulars. *Id*; *see also Dunnigan*, 944 F.2d at 181.

Further restrictions are placed on a defendant's right to a bill of particulars in the context of a conspiracy. For example, "the government is not required to reveal the names of unindicted co-conspirators . . . ." *United States v. Frye*, No. 5:01-CR-30058, 2002 WL 385574, at *1 (W.D. Va. Feb. 20, 2002) (unpublished) (citing *United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991)). Also, the government need not disclose when each participant entered or abandoned the conspiracy. *Id.* (citing *Feola*, 651 F. Supp. at 1132; *United States v. White*, 753 F. Supp. 432, 433 (D. Conn. 1990)); *accord Stroop*, 121 F.R.D. at 273 (citations omitted). Furthermore, the government is not required to disclose the identities of other persons present when the offenses took place. *Stroop*, 121 F.R.D. at 273 (citing *Feola*, 651 F. Supp. at 1133).

Here, Defendant Sidbury's argument would require the court to interpret the indictment in a hypertechnical manner. Count One of the Second Superseding Indictment reads:

> Beginning at a date unknown, but no later than on or about December 1, 2014, and continuing thereafter until up to and including May 4, 2015, in the Eastern District of North Carolina and elsewhere, the defendants, MUDIWA RUFARO MAKONI, JASON HUGH DEBNAM, MAURICE DONYAL KERSEY, DARRYL BERNARD PEARSALL JR. AND JOHN BOYNTON SIDBURY, did knowingly and intentionally combine, conspire, confederate and agree with other persons, known and unknown to the Grand Jury . . . .

[DE-40] at 1. In contrast, Count Three reads that the defendants "did knowingly combine, conspire, confederate and agree **with each other and with other persons**, known and unknown to the Grand Jury . . . ." *Id.* at 4 (emphasis added). While Count One may not be a model of clarity, the presence of the additional phrase in Count Three does not render Count One constitutionally defective. The undersigned agrees with the Government that the use of words such as combine, conspire, confederate, and agree indicates a mutual purpose and action, and the use of the listed defendants as a compound subject indicates a shared verb. Additionally, the undersigned accepts the Government's proffer that it has produced substantial discovery to Defendant Sidbury, which demonstrates that it intends to prove that the named defendants conspired with each other and with other persons, which would enable Defendant Sidbury to adequately prepare for trial. In light of the allegations contained in the indictment and the information provided to Defendant Sidbury in discovery, Defendant Sidbury possesses sufficient information about the charges against him so as to avoid surprise or unfair advantage and to enable him to prepare for trial. *See Amend*, 791 F.2d at 1125-26. Count One of the Second Superseding Indictment is constitutionally sufficient and Defendant Sidbury is not entitled to a bill of particulars. It is thus recommended that Defendant Sidbury's motion to dismiss count one [DE-143] be denied.

### G. Defendant Sidbury's Motion to Dismiss Count Three [DE-144] and Defendant Sykes' Motion to Join [DE-146]

Defendants move to dismiss Count Three of the Second Superseding Indictment as constitutionally insufficient in that it fails to provide sufficient factual specificity to allow Defendants to prepare for trial, or in the alternative, for a bill of particulars. Def. Sidbury's Mot. [DE-144]; Def. Sykes' Mot. [DE-146]. Defendants contend that Count Three does not provide

94

any facts (including time, place, or circumstances) that comprise the financial transactions at issue. *Id.* In response, the Government argues that Count Three is constitutionally sufficient as Defendants were charged with conspiracy to commit money laundering and there is no overt act requirement in that offense, and the Government has exceeded its obligations to Defendants by providing summaries of suspect financial transactions such that Defendants have actual notice of the evidence the Government may use against them. Gov't Resp. [DE-155].

Count Three of the Second Superseding Indictment alleges that Defendants conspired to commit money laundering in violation of 18 U.S.C. § 1956(h). [DE-40] at 3-6. Defendants contend that the indictment does not provide sufficient factual allegations as it simply lists multiple commercial transactions and "[n]o dates are provided, no amounts, no accounts, no parties, no locations, no circumstances." Def. Sidbury's Mot. [DE-144] at 4. Defendants are charged with conspiracy to commit money laundering, however, not money laundering itself, and conspiracy to commit money laundering has no overt act requirement. *See Whitfield v. United States*, 543 U.S. 209, 211 (2005); *United States v. Bolden*, 325 F.3d 471, 491 (4th Cir. 2003). Thus because 18 U.S.C. § 1956(h) does not have an overt act requirement, Defendants' argument that Count Three is deficient where it fails to provide any facts about transactions at issue is without merit. Additionally, the undersigned accepts the Government's proffer that it has produced substantial discovery to Defendants, including detailed spreadsheets which summarize suspect financial transactions which may be used at trial to illustrate the existence of the conspiracy, which would enable Defendants to adequately prepare for trial. In light of the allegations contained in the indictment and the information provided to Defendants in discovery, Defendants possess sufficient information about the charges against them so as to avoid surprise or unfair advantage and to enable them to prepare for trial. *See Amend*, 791 F.2d at 1125-26.

95

Count Three of the Second Superseding Indictment is constitutionally sufficient and Defendants are not entitled to a bill of particulars. It is thus recommended that Defendants' motions to dismiss count three [DE-143; DE-146] be denied.

### III. CONCLUSION

For the reasons set forth above, it is RECOMMENDED that Defendant Sidbury's motion to suppress cell phone tracking [DE-128] and Defendant Sykes' motion to adopt [DE-129] be GRANTED; to the extent the results of the vehicle tracking and the bank records are determined not to be fruit of the unconstitutionally-collected cell phone GPS data, it is recommended in the alternative that Defendant Sidbury's motion to suppress vehicle tracking [DE-133] be GRANTED and Defendant Sidbury's motion to suppress bank records [DE-136] and Defendant Sykes' motion to join [DE-146] be DENIED; and that Defendant Sykes' motion to suppress statements [DE-138] and motion to suppress fruits of the electronic search [DE-139], Defendant Sidbury's motion to suppress statements [DE-140], Defendant Sidbury's motion to dismiss count one of the indictment [DE-143], and Defendant Sidbury's motion to dismiss count three of the indictment [DE-144] and Defendant Sykes' motion to join [DE-146] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **September 6, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of

deadlines specified in local rules), 72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).**

SUBMITTED, the **22** day of August 2016.

Robert B. Jones, Jr.
United States Magistrate Judge